TRAVELERS INS. CO. v. ANSLEY.—124 S. W. (2d) 37.

Western Section. July 16, 1938.

Petition for Certiorari Denied by Supreme Court, January 21, 1939.

Emmett W. Braden, of Memphis (Armstrong, McCadden, Allen, Braden & Goodman, of Memphis, of counsel), for plaintiff in error.

H. W. Laughlin, Jr., and King, Taylor & King, all of Memphis, for defendant in error.

ANDERSON, J. The original plaintiff, Mrs. Ansley, as beneficiary in three policies of insurance on the life of her husband, recovered in this action against the insurer a judgment for $4,500, entered on a directed verdict in her favor, representing the aggregate of the additional indemnities provided by identical policy provisions which, in their material parts, read as follows:

"The Travelers' Insurance Company agrees to pay to the Beneficiary named in the above numbered Life Contract the amount of Additional Indemnity above stated in addition to the amount of insurance payable in the event of the death of the Insured under the said Life Contract immediately upon receipt of due proof that the death of the said Insured has resulted from bodily injuries effected directly and independently of all other causes through external, violent and accidental means within ninety days from the date of the accident which shall have caused such injuries and of

which . . . there is a visible contusion or wound on the exterior of the body . . ."

The evidence was undisputed and the questions for decision arise upon two contentions of defendant which in substance are:

(1) That although the fatal injury was unintended, unforeseen and unexpected and therefore accidental, the means by which it was effected was not accidental within the meaning of the quoted policy provisions; and

(2) That even if the fatal injury was effected by accidental means, said injury was not evidenced by a visible contusion or wound on the exterior of the body as required by the policy provision as a condition precedent to liability.

Whatever may be the rule elsewhere the limit of coverage of a policy insuring against death resulting from accidental means has been indicated by repeated decisions in this state.

Thus, in Stone v. Fidelity & Casualty Co., 133 Tenn., 672, 182 S. W., 252, L. R. A., 1916D, 536, Ann. Cas., 1917A, 86, it was said:

"The general rule is that an injury is not produced by accidental means, within the meaning of this policy, where the injury is the natural result of an act or acts in which the insured intentionally engages. A person may do certain acts the result of which produces unforeseen consequences resulting in what is termed an accident; yet it does not come within the terms of this contract. The policy does not insure against an injury that may be caused by a voluntary, natural, ordinary movement, executed exactly as was intended. Therefore, to determine the matter, we look, not to the result merely, but to the means producing the result. It is not sufficient that the injury be unusual and unexpected, but the cause itself must have been unexpected and accidental."

The foregoing was quoted and approved in Scott v. Metropolitan Life Insurance Co., 169 Tenn., 351, 87 S. W. (2d), 1011, where other cases announcing the same rule are referred to.

This is conceded to be the prevailing rule in this state but it is contended by the plaintiff that the facts make out a case of death resulting from an injury effected by accidental means within the purview thereof. The defendant, as stated, contends that the result only was accidental.

At the time of his death and a number of years prior thereto the insured held a responsible position with Buckeye Cotton Oil Mill. He was so constituted physically that a comparatively small quantity of intoxicating liquor, while not making him drunk, would result in his being rendered highly nervous after the effect had worn off. To relieve this condition which occurred at irregular periods only he was accustomed to taking a medicine known as "hypnotic compound" which could at that time be purchased at drug stores without a doctor's prescription.

On the evening of November 27, 1936, the insured, accompanied by his wife and other friends, went to the Claridge Hotel in Memphis to attend a dance. During the course of the evening the insured had several drinks of gin and beer. He was not rendered noticeably intoxicated but nevertheless was so nervous on the following day, which was Saturday, that he remained in bed. On Saturday night Mrs. Ansley called a neighborhood drug store and ordered some of the medicine referred to. It arrived in a two ounce bottle on which was the direction "two teaspoonsful as needed." The insured was given a dose about 7:30 P. M. He awoke around midnight and being still in a highly nervous condition was given another dose of two teaspoonsful. He then slept until about six o'clock the following morning when he got up. He ate no breakfast and shortly went back to bed. He apparently took some more of the medicine himself before 12 o'clock noon. About 3 o'clock in the afternoon he got up for the purpose of going to his place of employment. Before leaving his home he was given another dose of two teaspoonsful by his wife. He had planned to go out to dinner with his family and about 6 o'clock P. M. he called Mrs. Ansley by phone telling her that he would return about 6:30 o'clock for that purpose. When he arrived his wife noticed that he had a peculiar look about his eyes—that his eyes "looked kind of glassy." He informed her that he felt well enough to keep the dinner engagement but being dubious about the matter Mrs. Ansley called Mr. Tapp, a friend of the family, and requested him to come to their home. In about ten minutes thereafter Mr. Tapp arrived in company with Mr. Parker, another friend. When they arrived the insured was sitting on a bed with his overcoat on. He shortly arose, went to the bathroom, poured some of the medicine [just how much does not appear], into a glass, mixed water with it and drank it. After doing this, according to Tapp, "he staggered back, and I put my arm on his shoulder and we went back in the bed room and sat down on the side of the bed and he said a few more words and laid back down on the bed and went into a deep sleep, and his mouth flew open, and he snored. I called another fellow in, and then called the drug store, and called the doctor." When the doctor arrived he found the insured in a serious condition. "He had a pallor and his pulse was thready and weak, respiration shallow." Asked to describe his condition in lay language the doctor testified that "It is just like a shock . . . A condition of shock."

He was immediately carried to a hospital in an ambulance where his stomach was washed out and he was given cathartics and adrenalin, a heart stimulant. He died while on "the emergency table."

The medicine taken by the insured contained cannabis, a stimulant, chloral hydrate, a sedative, potassium bromide, a sedative, and

extract hyoscyamus, a stimulant. The maximum dose is two teaspoonsful. Ten to fifteen grains have been known to kill a person. Its effect depends in a measure on the physical condition of the one taking it. "One person may take it and have no effect and another person may have an idiosyncracy for it." Such was the testimony of a medical expert.

The expert evidence was to the further effect that the insured died from "chloral and bromide poisoning" resulting from the cumulative effect of the medicine.

There is no evidence to warrant the conclusion that the insured took the medicine with suicidal intent. In fact as stated the defendant concedes that the result, that is, his death, was unexpected, unforeseen and unusual and therefore accidental. But it is forcefully insisted that the means by which this result was accomplished was not accidental and that therefore under the rule prevailing in this state a recovery was not warranted. The argument is that the intention of the insured was to take the identical substance in the identical quantity that he did take; that "in a natural and voluntary movement he drank that portion of the medicine that he poured into the glass;" that "there was nothing unexpected or unforeseen or unusual in any of his movements in taking this medicine;" that "there is not the slightest indication that this medicine had become tainted, deteriorated or undergone some chemical change of which Mr. Ansley did not know;" that therefore though the result was unintended the means producing it was not accidental. In short it is insisted that the death was the natural result of an act in which the insured intentionally engaged and therefore there was no liability under our cases. Ramsey v. Fidelity & Casualty Co., 143 Tenn., 42, 223 S. W., 841, 10 A. L. R., 651.

The case principally relied upon by the defendant is that of Scott v. Metropolitan Life Ins. Co., supra. That case was before the court upon an appeal from the action of the trial judge in sustaining a demurrer to the declaration. The material averment was that the insured "suffered death from the effects of a sunstroke and fall, receiving a severe injury to the back of his head in addition to prostration from the sunstroke, while firing a boiler," etc. It was further averred that the injury that occasioned the insured's death was "unforeseen, unexpected, fortuitous, and accidental." There was no averment that the external means—the heat present in the boiler room—was unforeseen, unexpected or unusual; nor was there any averment that the insured's exposure to the means—his firing the boiler—was anything but an intentional act. It was accordingly held that no cause of action was stated under a policy provision similar to that here in question.

Pointing out that the case of Hahn v. Home Life Ins. Co., 169

Tenn., 232, 84 S. W. (2d), 361, was not in conflict with the conclusion reached the court said: "That was a case of death from ptomaine poisoning. Tainted food was the means of death. The intention of the insured was to eat wholesome food. His eating poisoned food was accidental."

The distinction thus pointed out is equally applicable and controlling in the present one. Plausible as it is upon its face we are unable to agree to the contention that the insured in the instant case actually took what he intended to take. True he intended to take the identical liquid which he took and it may be in precisely the quantity intended. But it is clear that in so doing he meant to take a harmless nerve remedy and based on his previous experience thought that was what he was doing, whereas, what he in fact took, instead of being harmless, was poisonous in the quantities taken. His ignorance of this fact introduced an entirely unforeseen and unexpected element into an act that was in other respects intentional, and hence rendered it "accidental" within the established meaning of the policy provision.

In other words the death was the natural result of what the insured actually did, that is, of the cumulative effect of the medicine actually taken, but it was not the natural result of what he intended to do, i. e., to take a harmless nerve remedy.

Without discussing them in detail we think the same distinction exists between the facts of the instant case and those of the other Tennessee cases relied on by the defendant.

It may be observed that the cases generally hold that death or injury results from accidental means when it is caused by taking poison by mistake or by taking an overdose by mistake. Notes: 7 A. L. R., 1141; 14 A. L. R., 790; 42 A. L. R., 245; 71 A. L. R., 1437.

It thus becomes necessary to consider the defendant's further contention that there was no proof of a visible contusion or wound on the exterior of the insured's body evidencing the injury that caused his death and hence under the express terms of the policy no recovery was warranted even though such injury was effected by accidental means.

The plaintiff first insists that this provision of the policies having been carried into the contracts for the purpose of guarding against fraudulent claims, and since the cause of the insured's death was undisputed, there was an "is no apparent reason why the court should consider a clause of this kind."

We think this view untenable and unsupported by the authorities. To so hold would be to read the provision out of the policies in every case where the insurer was unable to produce evidence controverting the theory of the cause of the death advanced by the claimant's proof and thus alter the terms of the contract which

the parties themselves made. The clause limits the coverage and the burden was on the plaintiff to prove that the loss was within the limits thus fixed. Cf. Paist v. Insurance Company, 3 Cir., 60 F. (2d), 476, and Fidelity Mutual Life Insurance Company v. Powell, 4 Cir., 74 F. (2d), 525, and cases cited.

The principal insistence upon this phase of the case is that if it be assumed to have been essential, the evidence was sufficient to meet the requirements of the policy when properly construed. The only facts relied upon to support this view are that when insured staggered to the bed after taking the last dose of the medicine he lay down "and went into a deep sleep and his mouth flew open and he snored;" his features were "very white," and "his head was drawn back."

There are numerous cases dealing with provisions of accident policies limiting the insurer's liability where there are no "external and visible marks or signs of injury" and the courts have been very liberal in their view with respect to what will constitute such a sign or mark within the meaning of these clauses. Numerous illustrations are collected in the note appearing in 39 A. L. R., 1011, and many of the cases there referred to are relied upon by the plaintiff in support of her view.

It is apparently her contention that there is no distinction between what is meant by a provision requiring that the fatal injury be evidenced by a visible "sign or mark of injury on the exterior of the body" and a provision to the effect that liability is conditioned on such injury being evidenced by "a visible contusion or wound on the exterior of the body." This contention seems to be supported by the case of Carvellero v. Travelers Ins. Co., 197 Minn., 417, 267 N. W., 370.

With due deference to the able court deciding that case we are unable to assent to this view or to give to the language of the clause here in question a meaning as broad as that insisted upon by the plaintiff.

In our opinion both clauses are contractual limitations on the extent of the coverage whereby there is excluded loss from injuries of which there is no external evidence. One defines the character of the evidence required as a visible "sign or mark." Hence, the broad view of this clause that if an internal injury "sends forth to the observation of the eye, in the struggle of nature, any signs of the injury [such as a pale and sickly look in the face] then those are external and visible signs, provided they are the direct results of the injury." United States Mutual Acc. Ass'n v. Barry, 131 U. S., 100, 9 S. Ct., 755, 760, 33 L. Ed., 60.

The other narrows the broad limits of the required evidence and prescribes that it shall consist of a "wound or contusion."

In other words under the one provision any manifestation of the

injury which can be properly classified as a sign or mark thereof is sufficient to meet its requirements, whereas, under the other, the parties agree upon the kind of sign or mark, namely, a bruise or contusion that must exist on the exterior of the body before liability is incurred.

In this view every external wound or contusion may be a sign or mark of an internal injury not otherwise apparent to the eye but we think it clear that every physical sign or mark of such an injury is not necessarily a wound or contusion as those words are commonly understood.

It seems to be contended that even in this view of the question, the proof was sufficient to meet the requirements of the policies, that is, that the above mentioned physical conditions appearing on the face and body were in effect wounds or contusions within the meaning of those terms as used in the contracts.

The basis of this contention is asserted to be the familiar rule that an insurance contract prepared by the insurer, when doubtful or ambiguous in its terms, will always be construed in favor of the insured. This rule is uniformly adhered to but must yield to the primary rule that policies of insurance, like other contracts, are to be construed so as to give effect to the intention and express language of the policy. Seay v. Life Ins. Co., 132 Tenn., 673, 179 S. W., 312, Ann. Cas., 1916E, 1157; Great Eastern Casualty Co. v. Solinsky, 150 Tenn., 206, 263 S. W., 71, 35 A. L. R., 1007.

It "cannot be availed of to refine away terms of a contract expressed with sufficient clearness to convey the plain meaning of the parties." Guarantee Co. of North America v. Mechanics' Savings Bank, 183 U. S., 402, 419, 22 S. Ct., 124, 131, 46 L. Ed. 253; Green v. Fidelity & Guaranty Co., 135 Tenn., 117, 185 S. W., 726.

In ascertaining the intention of the parties construction is unnecessary except where an ambiguity makes the contract susceptible of two interpretations. Moore v. Life & Casualty Ins. Co., 162 Tenn., 682, 40 S. W. (2d), 403. The rule contemplates that both interpretations shall be reasonable and justified by the usual, natural and ordinary meaning of the language employed unless it is obvious that the words are intended to be used in their technical connotation or unless by some known usage the terms used have acquired a meaning different from their popular sense. Pacific Mutual Life Insurance Co. v. Hobbs, 168 Tenn., 690, 80 S. W. (2d), 662; Conley v. Insurance Co., 8 Tenn. App., 405; Bonds-Sanders Paper Co. v. Travelers Ins. Co., 12 Tenn. App., 479; Aschenbrenner v. U. S. Fidelity, etc., Co., 292 U. S., 80, 54 S. Ct., 590, 78 L. Ed., 1137; Bergholm v. Life Ins. Co., 284 U. S., 489, 52 S. Ct., 230, 76 L. Ed., 416; Davis v. Standard Life Ins. Co., 5 Cir., 73 F. (2d), 330, 96 A. L. R., 599.

It is not permissible to lay the basis for the rule invoked

by resorting to a strained interpretation in order to introduce an ambiguity where none exists otherwise and then by construction adopt the meaning that it was necessary to employ in order to raise the ambiguity that it is claimed justifies and necessitates construction.

There is nothing to indicate that the words "wound or contusion" in the policy under consideration were used in other than their ordinary meaning, so the question here is whether the physical condition relied on to meet this requirement of the policies is within that meaning.

In no view of the question do we think it can be said that the fact that the insured "went into a deep sleep," or the fact that "his mouth flew open and he snored," was a "contusion or wound" evidencing the injury which resulted in the insured's death. So, if the plaintiff's view be sustained it must be on the theory that the pallor of his face, coupled with the fact that his head "was drawn back," met the requirements of the policies in this respect.

There is some justification for the conclusion that such a condition is an external "sign or mark" within the meaning of a policy provision employing those terms in the connection here under consideration and it appears to have been expressly so held. Note: 39 A. L. R., 1011. But we think to hold that it was a "wound or contusion" would be a clear perversion of the ordinary meaning of plain language. If the coverage had been limited to death from an injury of which there was no visible and external wound or contusion, as could have been done had the parties so desired, and the insurer was here defending on the theory that the pallor of the insured's countenance and his drawn head was a "wound or contusion," it can readily be imagined the dispatch with which it would be repelled on the ground that no such strained and unnatural construction of language would be permitted because clearly not intended by the parties when they employed the terms. This being true, the result must be the same where the resort to such a construction is by the insured rather than the insurer, for obviously the terms of the policies cannot be said to have meant one thing in regard to the latter and another in regard to the former. They must have meant the same to both the parties; otherwise there would have been no contract.

The rule which forbids the imputation of an unusual meaning to language used in an insurance or other contract applies as well when invoked by one party as by the other. In cases involving insurance policies its application does not depend upon which of the parties, whether insured or insurer, will benefit by the result. Great Eastern Casualty Co. v. Solinsky, supra.

The words "contusion" and "wound" involved in the instant case are of well known, commonly understood import (Paist

v. Insurance Co., supra) which must be given effect. There is, we think, no reasonable basis for the view that a pallid face and drawn head are within that meaning. We think the average person would be amazed to hear that any such significance could be ascribed thereto. To say that such a condition was a wound or contusion would be an excellent illustration of a strained and unnatural construction of terms having a common, ordinary meaning and which were obviously used in that sense. Paist v. Ins. Co., supra; see also: Lavender v. Ins. Co., 171 Miss., 169, 157 So. 101.

It is due the learned trial judge to say that it does not appear that he based his judgment on any such construction but that he doubtless took the view, which as above pointed out appears to be supported by highly respectable authority, that the provision in question had the same significance as those policy provisions employing in the same connection the terms "visible sign or mark." In this view, the proof was sufficient.

Apt illustrations of the application of the rule by virtue of which our courts decline to give a technical or strained construction to language used in insurance contracts are to be found in the cases of Hahn v. Ins. Co., supra, Great Eastern Casualty Co. v. Solinsky, supra, and State, etc., Ins. Co. v. Lee, decided by the Supreme Court in a memorandum opinion filed May 28, 1938 at Jackson.[1]

These cases in principle support the conclusion reached in the one before us.

The plaintiff relies strongly upon the case of Mutual Life Ins. Co. of New York v. Schenkat, 7 Cir., 62 F. (2d), 236, where the coverage was limited to death resulting from an accidental bodily injury "of which . . . there is evidence by a visible contusion or wound on the exterior of the body." The facts of that case were so different in a determinative sense from those before us that it is sufficient to say that we do not think the decision therein can be regarded as authority for the plaintiff's contention.

Other cases cited by plaintiff upon the question of the sufficiency of the proof appear to deal with policies wherein the parties employed the words "signs or marks" in the same connection that the words "wounds or contusions" are used in the policies here involved. What we have said sufficiently indicates our reasons for thinking such cases are not in point.

Since under the undisputed evidence the injury which resulted in the insured's death, though effected by accidental means, was not evidenced by a visible wound or contusion on the exterior of the body, the loss was not within the coverage of the policy.

Therefore the trial judge should have sustained the motion of

[1]Not designated for publication.

.the defendant for a directed verdict in its favor instead of that made by the plaintiff. This can be done here.

The judgment is accordingly reversed, and the suit dismissed. The plaintiff will pay the costs, including the costs of the appeal.

## On Petition to Rehear.

By a petition to rehear, our attention is for the first time directed to the fact that the defendant's motion for a directed verdict was not couched in general terms but purported to specify the particular ground on which it rested, that being in substance that the fatal injury was not effected by accidental means, with no reference to the other ground upon which we sustained the motion.

The rule is that where the motion is not couched in general terms but undertakes to specify the particular grounds upon which it is based, the movant upon an appeal in error is confined to that ground. Tennessee Central Ry. Co. v. Zearing, 2 Tenn. App., 451, and cases cited.

In the present case, however, the failure of the trial judge to direct a verdict for the defendant was made a ground of the motion for a new trial, and the theory as there stated is sufficient to cover that upon which this court acted. It would seem therefore, upon a casual consideration, that the defendant should be entitled to urge that ground in the appellate court on the theory that while the attention of the trial judge was not originally directed to that particular ground, it was so directed in connection with the motion for a new trial and acted on.

Upon reflection, however, the fallacy of this view is apparent. The reason for the rule confining the movant to the ground originally specified is that, had new grounds been seasonably stated, the trial "court could then have permitted plaintiff, and it would have been his duty to have permitted plaintiff, upon a proper showing, to introduce testimony to" supply the deficiency in the evidence pointed out by the motion. Lawson v. Producers' & Refiners' Corp., 157 Tenn., 455, 9 S. W. (2d), 1026, 1027.

The rule being bottomed upon this reason, obviously the spirit of its requirements could not be met by incorporating in the motion for a new trial a ground of the motion for a directed verdict that was not specified as a basis of that motion when originally made upon the trial.

The result is that the petition to rehear is granted to the extent that the former judgment sustaining the defendant's motion for a directed verdict is recalled.

However, for the reasons stated in the opinion originally filed, the trial judge was in error in directing a verdict for the plaintiff at the conclusion of all the evidence and rendering judgment thereon. The ground of the motion for a new trial challenging this action should have been sustained and a new trial granted. This

468 

will be done here. Let a judgment be entered reversing the judgment of the circuit court and remanding the case for a new trial. Senter and Ketchum, JJ., concur.