Marschel Houston carried an accident policy with a death benefit of $2000 with the Mutual Benefit Health Accident Association, and he met a violent death by a gunshot wound in the hand of his son-in-law, Virgil Pearson, on August 30, 1937, and the widow and beneficiary, Alice Houston, brings this action to recover upon the policy.
The deceased, Marschel Houston, was an employee of the Southern Railway Company at Robbins, Tennessee, and he boarded at the home of his son-in-law and daughter, Mr. and Mrs. Virgil Pearson; Houston's home was in a near-by town, Crossville, Tennessee, where his wife lived. Pearson was also employed by the Southern Railway Company *Page 572 
as a member of its section crew, and he had arrangements with other members of the section crew to transport them to and from their homes at Robbins to their work upon the line in his automobile. On Sunday, August 30, Houston was at his home at Crossville with his wife and family, and expected to remain over Monday, which was his birthday, when he was to be given a birthday party.
On this Sunday morning back in Robbins, Tennessee, his daughter and her husband had a family fuss and fight, and it became so violent that the daughter went to her father's room and procured his pistol with the purpose of attacking or intimidating her husband, but he took the gun away from her. She then grabbed up a rock and threw it at him. She announced that she was leaving him, and she took her baby and the family car and drove to her father's home at Crossville. When she arrived there she told her family of what had occurred and that she had parted from her husband. Her father asked her why she had driven off in the car, that she should have come on the bus, for the reason that Pearson had to have the car on Monday morning to transport the section hands to their work. He stated that they would have to return the car to be used for this purpose, and he took his car and the Pearson car, accompanied by his daughter and a friend who drove the Pearson car and returned to Robbins for the purpose of returning Pearson's car and to gather up his effects and his daughter's clothing in the Pearson house and bring them to his home at Crossville.
The father and daughter, accompanied by the friend, Nathan Hedgecoth, arrived in Robbins between 11:30 and 12 o'clock Sunday night, and they drove to the Pearson home and knocked upon the front door, but could not arouse Pearson. And not being certain that he was at home, the father and daughter decided to go to the side door and enter into Pearson's bedroom, knowing that the screen was fastened by wire and the door was propped closed by a chair. They entered at this door and found Pearson in bed. He states that he was not sufficiently aroused by the knocking to get up and open the door. The father found his lighted lantern by the bed and he took it and went to the front door and let in Hedgecoth who went to Pearson's room and stood by the door talking with Pearson; Mrs. Pearson then lighted two lamps, taking one to the bedroom of her husband and giving the other to her father, who was engaged in his room in gathering up his clothing, and the daughter set to work gathering up her clothing and effects and she and her father were carrying the clothing and placing them in the father's car to take them back to Crossville with them, and in the meantime Pearson remained in bed and was talking with Hedgecoth. Mrs. Pearson had returned to the room and was standing at the foot of her husband's bed with her back to the bed, and her father was in his room going *Page 573 
through the bureau drawers, when he exclaimed "Where is my pistol?"
Pearson replied, "I have it here under my pillow."
Houston said, "What the devil have you got my gun in your bed for?" He then walked to the bed to get his pistol. Pearson took the pistol from under his pillow and was pointing it in the general direction of the father and the daughter, and the father grabbed the pistol in Pearson's hand. Pearson states that he held onto the pistol momentarily for the purpose of telling his father-in-law not to let his wife have the pistol for he feared that she might shoot him, because of what occurred in the morning. But there was not time for this, for immediately upon grabbing the pistol it was discharged, striking Houston above the eye, passing out through the top of the skull, and the bullet passing near the daughter's head lodged in the ceiling of the room. In the movement the gun was discharged again, the bullet going into the wall above the head of the bed. Houston fell across Pearson on the bed and died instantly.
The daughter, having her back to the bed, did not see what occurred, but Hedgecoth, who was standing talking to Pearson, had seen the whole occurrence. He states that Houston was not angry when he approached the bed to get the pistol, and it is shown that Houston was friendly with Pearson and often sided with him in a controversy with the wife. Pearson was not in a temper, for he had been lying there talking to Hedgecoth and there were no angry words passed between the parties prior to the shot. Hedgecoth testified that Houston only grabbed the pistol and it was in Pearson's hands pointing towards Houston and in the general direction of the daughter, and that Houston did not strike Pearson, as is claimed by the defendant.
(The court must disregard the theory of the defendant that Houston first struck Pearson in the face with his fist, and that he used violent language in approaching Pearson for two reasons, (1) the jury discredited this theory, and (2) the fact was proven by the sheriff and a deputy who were not present at the altercation, and who testify as to a conversation with Pearson at an investigation of the homicide. This is hearsay testimony and is not substantive evidence and competent only for the purpose of impeaching Pearson. And had it impeached Pearson, the plaintiff's theory was established by the uncontradicted evidence of the disinterested witness Hedgecoth.)
Houston's pistol was a 45 automatic Army pistol, with a safety guard on each side of the handle; by pulling and not releasing the trigger the gun continued to fire until it emptied its chamber. Pearson testifies that when he took the pistol from under his pillow he did not know the safety guard was not on, and he does not know *Page 574 
how his finger came in contact with the trigger, that he did not know the gun was loaded, and he did not intend to shoot Houston; that he held on to the pistol for the purpose of telling Houston not to give the pistol to his wife.
Upon this state of facts the defendant insists that the deceased voluntarily exposed himself to a known danger, and that he did or should have anticipated a fatal result, which precludes a recovery upon the policy sued upon. The defendant relies upon the case of Koester v. Mutual Life Insurance Co., 6 W.W. Harr., Del., 537, 179 A., 327, 329, which seems to be peculiarly applicable to the admitted facts of the case at bar.
In the case, the plaintiff and her husband, the insured, were in the room in their house. For some time prior thereto the insured had lived apart from his wife, and not at their home. On the day in question the insured had come to the home of his wife and they had had some argument about the discharge of a practical nurse who was staying with the plaintiff at her home. At the time the plaintiff was in a highly nervous condition and was afraid to stay in the home alone. The insured told her he would go out and buy her a gun, and she replied that he need not do that because she already had one. She produced a gun, which was an automatic. The insured then said she was not in a fit condition to have the gun and demanded that she give it to him. The plaintiff refused, and thereupon the insured attempted to take the gun from her and she strongly resisted his attempt.
A struggle then ensued between the plaintiff and the insured for possession of the gun and during the continuance of this trouble the weapon was discharged, the bullet therefrom entering the body of the insured, causing his death a short time thereafter.
It appears that there was no quarrel and apparently no bad feeling between the plaintiff and the insured which preceded the struggle, the only reason that Koester secured the possession of the gun was that he thought his wife was not in a fit condition to keep such gun in her possession.
The trial court directed a verdict in favor of the defendant and upon appeal the judgment was affirmed. The court, among other things, saying:
"We are of the opinion that while the death was accidental, and that it was unforseen and unexpected, yet the means which caused the death was not accidental.
"In a struggle to obtain possession of a loaded firearm, whether automatic and equipped with safety devices or not, the discharge of the weapon during the struggle was not of an unforeseen nor unusual result. It was the natural consequence of the effort made by the insured *Page 575 
to obtain the weapon, and might well have been expected as probably apt to occur during the course of the struggle.
"This voluntary attempt of the insured, we think, was the direct result of his death. If there had been no such attempt by the insured, there would have been no such injury to him. Therefore, his death was not caused by accidental means within the meaning of the policies of insurance. Under all the evidence in the case, there was no cause of action shown, and the trial Court was correct in its instruction to the jury to find a verdict for the defendant."
It is conceded in the opinion that "the death was accidental," but the conclusion is that since the result should have been anticipated this character of accidental death is not covered by the policy. Since the death was admittedly accidental, then it seems to this court that the doctrine applied by the court in that case is near akin to the doctrine of contributory negligence or assumption of the risk (which are defenses in tort actions), and this is not a defense to an action ex contractu unless made so by a provision of the policy.
Suppose a policyholder is a reckless and unsafe driver of an automobile, and the prudent man would readily conclude that the insured should anticipate his early and sudden death, resulting from his reckless and fast driving, which "was not an unforseeable nor an unusual result," then could companies defend upon the insured's voluntary exposure to a result which was natural and one to be expected? And suppose the insured were driven by a reckless driver, which he should have known would endanger his life by his recklessness, is the insured required to have forseen the result and be held accountable for his negligence in exposing himself?
If this be the rule, then the issue in every case is the insured's negligence in not forseeing the result when he has exposed himself to danger.
The insured's voluntary exposure to danger that should have been anticipated is sometimes relevant in determining whether or not the death was in fact accidental. For instance, if a man is intentionally shot by another, in common parlance, this is never an accidental death, but in legal nomenclature it is classified as an accidental death although the man be intentionally attacked and shot in the event the attack was a justifiable surprise on the part of the man shot. If he voluntarily exposed himself to a known danger or injury which is intentionally inflicted, the courts will not classify the injury as accidental. Insurance Co. v. Bennett, 90 Tenn. 256, 16 S.W. 723, 25 Am. St. Rep., 685; Union Casualty Co. v. Harroll, 98 Tenn. 591, 40 S.W. 1080, 60 Am. St. Rep., 873; Mutual Life Insurance Co. v. Distretti,159 Tenn. 138, 17 S.W.2d 11; McGuire v. Life Insurance Co.,164 Tenn. 32, 46 S.W.2d 53; Employers' Indemnity Corp. v. Grant, 6 Cir., 271 F., 136, 20 A.L.R., 1118 and Note. *Page 576 
This inquiry is pertinent where the injury grew out of an act intentionally inflicted, but in the absence of intent, purpose, and volition on the part of the party inflicting the act, then it must be classified concededly as an accidental act. The great weight of authorities does not support the proposition that where the homicide is accidental in fact then that the deceased is chargeable with lack of care for his own safety. There are a number of cases cited where the court was dealing with the definition of an accident, to determine if the death, the result of a natural cause which grew out of an infection or an exposure which resulted in a natural death, was in fact an accidental death. For instance, if one has a tooth pulled, infection results and he dies (Ramsey v. Fidelity Casualty Co., 143 Tenn. 42, 223 S.W. 841, 13 A.L.R., 651), another exposing himself while firing a furnace to great heat and suffers a sunstroke and dies (Scott v. Metropolitan Life Ins. Co., 169 Tenn. 351,87 S.W.2d 1011); the inquiry in each case was to determine if the death was in fact accidental, and these authorities are not in point where it is shown without contradiction that the homicide grew out of an act performed without intent, design, or volition, to accomplish the result which ensued. The court is of the opinion that the trial judge did not err in submitting the facts of this case to the jury.
It does not affirmatively appear that the trial judge committed reversible error in his charge to the jury, and this court cannot reverse in the absence of a showing of reversible and prejudicial error. Code 1932, Section 10654. This statute was passed since the decision in the case of Louisville N. Railroad Co. v. Gower, 85 Tenn. 465, 3 S.W. 824, and in that case from the facts as they appear in the record, the court must have been satisfied that the members of the jury could not be classified as ordinary prudent men as a standard for judging the conduct of the plaintiff. Ordinarily, a juror must use himself as a standard, and to determine if the plaintiff has acted prudently, he must first put himself in the place of the plaintiff and ask himself if he would have been justified in doing the same. We know of no other standard a juror might adopt, and the jurors were selected by the parties and the presumption of law is that they were ordinary prudent men in the absence of a showing to the contrary.
The judgment of the lower court is affirmed with costs.
Ailor and McAmis, JJ., concur. *Page 577