AMERICAN EMPLOYERS INSURANCE COMPANY, Appellee, v. KNOX-TENN EQUIPMENT COMPANY, Appellant, and TOM JENKINS, d/b/a JENKINS and JENKINS FLOOR COVERING COMPANY, Appellee.

—377 S. W. (2d) 573.

Western Section. May 6, 1963.

Certiorari Denied by Supreme Court January 8, 1964.

Ambrose, Wilson & Saulpaw, Knoxville, for appellant.

J. H. Doughty, Robert R. Campbell, and Hodges, Doughty & Carson, Knoxville, for appellee, American Employers Insurance Co.

Carey E. Garrett, Knoxville, for appellee Tom Jenkins, d/b/a Jenkins & Jenkins Floor Covering Co.

CARNEY, J. This case involves the construction of the products liability provision of what is designated as a general-automobile liability policy (comprehensive form) issued by the plaintiff below, American Employers Insurance Company, in favor of the defendant below, Knox-Tenn Equipment Company. The Circuit Judge, sitting without a jury, and hearing the case upon discovery depositions read as evidence together with exhibits thereto rendered a judgment unfavorable to the appellant, Knox-Tenn Equipment Company.

The defendant below, Tom Jenkins, d/b/a Jenkins and Jenkins Floor Covering Company, had the subcontract to lay a hardwood floor in the new gymnasium of the Meigs

County High School at Decatur, Tennessee. The contract called for a special type hardwood floor to be laid over a concrete slab and affixed to the concrete slab by a special and patented system known as the Loxit system. Under the Loxit system a large number of metal channels are affixed to the concrete. This is done by laying the channels on the concrete, leveling them with shims, then drilling ¼ inch holes in the concrete through holes indicated and stamped on the metal channels; into these holes are driven hollow lead cylinders or anchors and then large nails or studs with broad heads are driven into the lead anchors, thereby expanding them and causing them to fit tightly against the concrete. The heads of the studs hold the channels down. After the channels are affixed to the concrete the tongue and groove hardwood floor is then laid over and perpendicular, or at right angles, to the channels. Small metal fasteners or clips, which fit snugly into the channels and overlap the tongue on the flooring are driven up against the flooring thereby fastening it tightly against the channels.

Jenkins, the subcontractor, used about fourteen diamond tip bits with which to drill the holes in the concrete. These diamond tip bits were purchased from the defendant, Knox-Tenn Equipment Company. Knox-Tenn ordered them from the manufacturer, E. J. Longyear Company.

After the floor was completed it buckled in several places and part had to be removed and reinstalled at a substantial expense to the subcontractor, Jenkins. On reinstallation carbon tip bits bought from another supplier were used by Mr. Jenkins. There has been no further trouble with the floor since that time.

Jenkins filed suit against Knox-Tenn Equipment Company for $9,300.00 damages averring that the diamond tip bits which were sold to him were too large; that as a result of the larger holes in the concrete the lead sleeves did not expand sufficiently to hold the floor tight. Changes in air moisture then caused the floor to buckle.

The defendant, Knox-Tenn Equipment Company, notified its insurer, the plaintiff, American Employers Insurance Company, to defend the suit brought by Jenkins. American Employers Insurance Company refused and filed its suit for declaratory judgment against Knox-Tenn Equipment Company and Jenkins. Jenkins was enjoined from proceeding with his suit against Knox-Tenn until American Employers Insurance Company's suit for declaratory judgment had been heard and settled.

Mr. Alfrey, office manager and salesman for Knox-Tenn Equipment Company, learned that Jenkins' subcontract called for the use of the Loxit system in laying the gymnasium floor. After making inquiry of several sources he learned that the system required a ¼ inch bit to bore the holes in the concrete. Mr. Jenkins had never completely laid a Loxit system floor and did not know the exact type or size drill bit necessary. The manufacturer of the Loxit system did not sell drill bits and made no recommendation as to the type drill bit to use. The Loxit system only called for ¼ inch holes in the concrete.

Mr. Alfrey ordered a ¼ inch diamond tip drill bit from the E. J. Longyear Company as a sample or demonstration bit. This bit was received by Knox-Tenn Company on November 2, 1960, and delivered immediately to Mr. Jenkins. Mr. Jenkins used the sample drill bit in a limited way

and found it apparently satisfactory. On January 30, 1961, Mr. Jenkins authorized Mr. Alfrey to order four additional bits like the sample bit. Mr. Alfrey placed the order but before the new bits were received Mr. Jenkins wore out the first bit which had been furnished him and he authorized Mr. Alfrey to increase the order from four to thirteen new diamond tip ¼ inch bits.

■ The proof indicates that it is a matter of general knowledge in the building trade that a ¼ inch drill bit is usually a little larger in diameter than .250 inch. However, there seems to be no prevailing understanding in the building trade as to the maximum tolerance allowable for a ¼ inch bit. The sample drill bit which Knox-Tenn ordered from the Longyear Company had an actual diameter measurement of .262 inch and this measurement was printed on the price list and/or other literature furnished by the Longyear Company.

On January 30, 1960, when Knox-Tenn Company ordered the additional drill bits, the Longyear Company had already published a new price list and accompanying literature which showed the diameter of the new drill bits to have a tolerance of .295 inch. However, Knox-Tenn Company had not received the new price list and new information at the time it ordered the new drill bits for Mr. Jenkins. All of the additional bits were received by the Knox-Tenn Company, delivered to Mr. Jenkins and used by him without any knowledge or suspicion on the part of either Knox-Tenn Company or Jenkins that the new drill bits bore any larger tolerance than .262 the size of the demonstration bit which was first furnished Mr. Jenkins. The new drill bits were ordered and received by Knox-Tenn Company simply as ¼ inch bits.

After the floor buckled a micrometer was placed on the several used drill bits and they ran in size from .282 inch to .292 inch. Mr. Jenkins contended that the extra size of the drill bits was responsible for the anchors or sleeves not being driven tightly into the holes in the concrete. The looseness of the anchors or sleeves allowed the floor to buckle. The new price list and literature of Longyear Company showing the new size or tolerance of the drill bits to be .295 inch were not received by Knox-Tenn Company until after the drill bits had been received and delivered to Jenkins. The attention of officials of Knox-Tenn Company was not directed toward the increase in size until after the floor had buckled and the micrometer showed the increased size of the drill bits.

It is significant to note that at no time prior to the buckling of the floor was any mention made by any of the parties as to the matter of micrometer tolerances in the installation of the Loxit system of flooring. The specifications prescribed by Loxit Systems, Inc. did not mention it nor did the specifications for the Meigs County High School contract provide for precise tolerances on the installation of the flooring. The only reference in any of the specifications to the measurement of the diameter of the bits, stud and anchor assembly, or the holes themselves is in the Loxit catalog which refers to the prepared holes in the metal channels as being ¼ inch in diameter.

Assuming that Mr. Jenkins can prove all of these facts above stated in his suit against Knox-Tenn Company in Circuit Court of Knox County the question presented to this court on this appeal is whether or not American Employers Insurance Company is obligated to defend the suit on behalf of Knox-Tenn Company and to pay the judgment if cast in the lawsuit.

The pertinent provisions of the policy are as follows:

"Coverage D—Property Damage Liability—Except automobile. To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident.

\* \* \* \* \* \*

"This policy does not apply:

"(a) to liability assumed by the insured under any contract or agreement except under coverages B and D, (1) a contract as defined herein or (2) as respects the insurance which is afforded for the Products Hazard as defined, a warranty of goods or products;

\* \* \* \* \* \*

"(c) under coverages B and D, to any obligation for which the insured may be held liable in an action on a contract or an agreement by a person not a party thereto:

\* \* \* \* \* \*

"3. Definitions.

(g) Products Hazard. The term 'products hazard' means: (1) goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, if the accident occurs after possession of such goods or products has been relinquished to others by the named insured or by others trading under his name and if such accident occurs away from the premises owned, rented or controlled by the named insured or on premises for which the classification stated in division (a) of the

declarations excludes any part of the foregoing; provided, such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, rented to or located for use of others but not sold.

\* \* \* \* \* \*

"5. Limits of Liability. Coverages C and D. The limit of property damage liability stated in the declarations as applicable to 'each accident' is the total limit of the company's liability for all damages arising out of injury to or destruction of all property of one or more persons or organizations, including the loss of use thereof, as the result of any one accident.

"6. Limits of Liability—Products. Coverages B and D. Subject to the limit of liability with respect to 'each accident', the limits of bodily injury liability and property damage liability stated in the declarations as 'aggregate products' are respectively the total limits of the company's liability for all damages arising out of the products hazard. All such damages arising out of one lot of goods or products prepared or acquired by the named insured or by another trading under his name shall be considered as arising out of one accident."

In sustaining the position of American Employers Insurance Company His Honor the Trial Judge said in part as follows:

"The purchase of the bits by Knox-Tenn from the manufacturer was not an accidental cause but was an

intentional and voluntary act. The sale and delivery of the bits by Knox-Tenn to the user Jenkins was also an intentional and voluntary act. The use of such bits to drill the holes in the concrete slabs in the high school building was an intentional and voluntary act on the part of Jenkins. The effect of voluntarily using the channels and nails in the oversized holes was not an accident but the natural and proper consequence of mistakenly or erroneously using an oversized tool. The mistake originally occurred in the manufacturer's plant. This would not be an accident within the terms of the policy issued to Knox-Tenn Equipment Company providing coverage for damage to property caused by accident.''

This court has had the benefit of excellent briefs and persuasive arguments by solicitors for both parties. The research of counsel and this court has not discovered any case ''on all fours'' with the present case. Mr. Chief Justice Grafton Green in the case of State ex rel. Tobin v. Independent Life Insurance Company, 1935, 170 Tenn. 105, 92 S. W. (2d) 407, defined accident as follows:

''An accident as defined in workmen's compensation cases and in our decisions defining accidental means as those words are used in insurance policies is an event not reasonably to be foreseen, unexpected, and fortuitous. Hartford Accident & Indemnity Co. v. Hay, 159 Tenn. 202, 17 S. W. (2d) 904; King v. Buckeye Cotton Oil Co., 155 Tenn. 491, 296 S. W. 3, 53 A. L. R. 1086; Meade-Fiber Corp. v. Starnes, 147 Tenn. 362, 247 S. W. 989; McFarland v. Massachusetts Bonding & Insurance Co., 157 Tenn. 254, 8 S. W. (2d) 369, 64 A. L. R. 962; Stone v. Fidelity & Casualty Co., 133 Tenn. 672, 182 S. W. 252, L. R. A.

1916D, 536, Ann. Cas. 1917A, 86; Accident Insurance Co. v. Bennett, 90 Tenn. 256, 16 S. W. 723, 25 Am. St. Rep. 685.''

Our earlier Tennessee cases attempted to distinguish between accidental means and accidental results. In the case of Stone v. Fidelity & Casualty Company, 133 Tenn. 672, 182 S. W. 252, L. R. A. 1916D, 536, it was held that the rupture of the retina was not an accident within the meaning of an accident policy where the insured suddenly reached up to get a paper above his bed and excessive blood pressure from the exertion caused a rupture of the retina. In Ramsey v. Fidelity & Casualty Co., 1919, 143 Tenn. 42, 223 S. W. 841, 13 A. L. R. 651, it was held that where an insured died from blood poisoning which resulted directly and independently from the pulling of a tooth that the death was not accidental within the meaning of the accident policy.

However, in the case of Hahn v. Home Life Insurance Co., 1935, 169 Tenn. 232, 84 S. W. (2d) 361, the parties stipulated that ''the insured 'died solely of ptomaine poisoning as the result of ignorantly eating sauage a day or so before his death, which food he supposed to be good, but which was in fact bad or tainted.' '' The life policy sued on carried a double indemnity rider which provided for payment in the event a death occurred from bodily injuries caused by external means of an accidental or violent nature. The rider also contained a provision that there would be no liability if the death resulted from poison or from self destruction, whether sane or insane. Our Tennessee Supreme Court held that the death of the insured was caused by external means of an accidental nature and that the death of the insured from ptomaine

poisoning was not death from poison within the meaning of the policy.

In Mutual Benefit Health & Accident Association v. Houston, 1938, 22 Tenn. App. 570, 124 S. W. (2d) 722, the eastern section of this Court held that where an insured was intentionally shot and killed it was classified as an accidental death because the attack was a justifiable surprise on the part of the man shot. See Mutual Life Ins. Co. v. Distretti, 159 Tenn. 138, 17 S. W. (2d) 11, in which our Supreme Court held that the insured's death was not an accidental death and the later case of Provident Life & Accident Insurance Co. v. Maddox, 1945, 184 Tenn. 70, 195 S. W. (2d) 536, in which the Supreme Court held that where a police officer shot an insured who was advancing upon him that such death was by "accidental means" and did not result from the "intentional act of the insured or of any other person."

The trend of modern decisions is to treat the terms "accidental means, accident, accidental result, accidental injury, accidental death" and the like as being legally synonymous. See Insurance, Vol. 29 Am. Jur. 312, Section 1166. See also the article "Accidental means—a Serbonian Bog in Tennessee" 24 Tenn. Law Review, 574.

In the case of Travelers Insurance Co. v. Ansley, 1938, 22 Tenn. App. 456, 124 S. W. (2d) 37, the insured had been accustomed to taking a nerve medicine after he had been drinking intoxicating liquors. He took an overdose of the nerve medicine and died from chloral and bromide poisoning. There was no evidence that the insured took the medicine with suicidal intent. The wife, as beneficiary, sought recovery under three policies which provided for double indemnity in case of death "resulting from

external, violent and accidental means within ninety days from the date of the accident which shall have caused such injuries and of which there is a visible contusion or wound on the exterior of the body.'' It was the contention of the insurance company that the death was not accidental within the meaning of the policy provisions.

The insurance company contended, second, that even if the death was caused by accidental means that there was no visible contusion or wound on the exterior of the body as required by the policy. This court, speaking through Judge Hu C. Anderson, held that death was caused by accidental means. From the opinion we quote as follows: .

''* * * Plausible as it is upon its face we are unable to agree to the contention that the insured in the instant case actually took what he intended to take. True he intended to take the identical liquid which he took and it may be in precisely the quantity intended. But it is clear that in so doing he meant to take a harmless nerve remedy and based on his previous experience thought that was what he was doing, whereas, what he in fact took, instead of being harmless, was poisonous in the quantities taken. His ignorance of this fact introduced an entirely unforeseen and unexpected element into an act that was in other respects intentional, and hence rendered it 'accidental' within the established meaning of the policy provision.

''In other words the death was the natural result of what the insured actually did, that is, of the cumulative effect of the medicine actually taken, but

it was not the natural result of what he intended to do, i. e., to take a harmless nerve remedy."

The case was reversed because there was no external wound or contusion.

There seems to be very few cases in other jurisdictions construing products liability insurance policies involving the word "accident." Knox-Tenn Company cites the case of Andrews and George Company v. Canadian Indemnity Company (British Columbia) 1952, which was mentioned in 45 A. L. R. (2d) 996. In that case the insured, a manufacturer of glue, through some unexplainable error in the manufacturing process produced defective glue. The glue was supplied to a plywood manufacturer. The plywood in which the glue was used became defective and the insured was held liable for damages. The insured then brought suit against the insurance company to recover under a policy designated as "comprehensive business liability policy." The court rejected the contention of the insurance company that the defect in the manufacture of the glue was not an accident within the meaning of the policy and held that the manufacturing and furnishing of the defective glue was an accident within the meaning of the policy.

In the case of Ducker v. Central Surety Company, 1959, 234 S. C. 228, 107 S. E. (2d) 342, plaintiff was engaged in the business of selling home furnaces and carried a liability policy with the defendant whereby the insurer agreed to pay on behalf of the insured all sums which the insured should become legally obligated to pay because of injury or destruction of property caused by accident arising out of goods or products sold. The plaintiff installed a furnace for a customer which repeatedly ac-

cumulated soot and gas resulting in explosions and smoked walls. The proof was that the plaintiff had been installing similar furnaces for many years without difficulty of this nature. The Supreme Court of South Carolina held that it was a question for the jury to determine whether or not there was an accident within the coverage of the insurance policy.

In Ritchie v. Anchor Casualty Co., 135 Cal. App. (2d) 245, 286 P. (2d) 1000, the policy insured against liability for damages "caused by accident." The plaintiffs sold peanut oil to some corn chip manufacturers. The peanut oil was rancid; it ruined the corn chips and clogged up the machinery of the purchasers. The purchasers recovered by way of settlement $1,300.00 and the manufacturer brought suit against the insurance company under the policy. The court held that the furnishing of the rancid peanut oil constituted an accident within the meaning of the policy.

There is a very interesting case on products liability reported in 79 A. L. R. (2d) 390, styled Orthopedic Equipment Co., Inc. v. Eutsler from the U. S. Court of Appeals, Fourth Circuit, March 14, 1960, 276 F. (2d) 455. In that case the manufacturer of a surgical nail designed for use on fractured bones by skilled surgeons was held liable in damages to a patient with a fractured leg for injuries sustained from the use of the nail which was too thick to fit the canal prepared by surgeons with a medullary reamer or drill.

The doctors who performed the operation testified that in accordance with the prevailing interpretation of the profession they understood that the cross sectional dimension, imprinted on the nail, meant that it could and

would be inserted into a hole made with a reamer bearing a diameter measurement corresponding to the number or size appearing on the nail. The marking on the nail was "OEC 9x40." The 9 represented 9 mm. in diameter. The nail varied from 9.27 to 10.12 mm. The U. S. Circuit Court of Appeals held that the evidence was sufficient to raise a jury question of misbranding the nail in violation of the Federal Food, Drug, and Cosmetic Act even though the plaintiff had no privity of direct contract with the defendant.

■ The policy in the instant case was drawn by the insurer and its terms and provisions must be construed strongly in favor of the insured. Raulston v. Mutual Benefit Health and Accident Co., 22 Tenn. App. 101, 118 S. W. (2d) 881.

To paraphrase the words of Judge Anderson in Travelers Insurance Company v. Ansley, supra, the larger holes bored in the concrete slab of the Meigs County High School gymnasium were the natural result of what Mr. Jenkins actually did, namely drill with a bit that was too large; but they were not the result of what he intended to do, namely drill with a bit the same size as the one he first used and deemed satisfactory. The sample or trial bit had a tolerance of only .262 whereas the bits he used later measured from .282 to .292 inch.

■ In our opinion Mr. Jenkins' using drill bits that were too large while supposing them to be the right size is analogous to eating tainted sausage in the Hahn case and taking too much nerve medicine in the Ansley case. We hold that the damage to the gymnasium floor was a result of an accident within the meaning of the products liability provision of the policy.

It must be remembered that this proceeding was initiated by American Employers Insurance Company against Knox-Tenn Equipment Company and Tom Jenkins, d/b/a Jenkins Floor Covering Company seeking an injunction against Tom Jenkins from proceeding with his suit in Circuit Court against Knox-Tenn Equipment Company until the lower court had adjudicated the liability of American Employers Insurance Company to defend the suit by Jenkins and to pay the judgment, if any, obtained by Jenkins against Knox-Tenn Equipment Company in the primary suit.

The Trial Judge found that the damage to the gymnasium floor was not the result of an accident; he sustained the contention of American Employers Insurance Company and held that it was neither obligated to defend the suit of Jenkins against Knox-Tenn nor to pay any judgment obtained by Jenkins against Knox-Tenn. The Trial Judge also dissolved the injunction against Tom Jenkins proceeding with his suit against Knox-Tenn Equipment Company. Knox-Tenn has appealed from the action of the Trial Judge in exonerating American Employers Insurance Company from obligation to defend the suit by Tom Jenkins and to pay any judgment obtained by Tom Jenkins against Knox-Tenn.

None of the parties have appealed from the action of the Trial Judge in dissolving the injunction against Tom Jenkins proceeding with the trial of the primary suit against Knox-Tenn Equipment Company in the Circuit Court of Knox County. Such suit may or may not have been tried at the time of the writing of this opinion but this court has no knowledge, direct or indirect, as to the outcome, if any, of such suit.

Whether Knox-Tenn Equipment Company is liable in any amount to Jenkins cannot be decided in this suit. Such liability is by no means clearly established from the evidence presented in this case. The architect, Mr. Good, testified that the plans and specifications for laying the gymnasium floor merely provided for the Loxit system and made no specifications or provisions as to the type or size of drill bit to be used.

Mr. Danner, representative of the manufacturer of the Loxit system, testified that he was present in an advisory capacity at the time of the laying of the gymnasium floor by Mr. Jenkins; that the specifications of the Loxit system made no recommendation as to the type or size drill bit to use; that his company did not furnish or recommend any particular drill bit but that his company did furnish the lead anchors or sleeves and the nails to be driven therein as well as the other metal parts to be used in the laying of the floor. The proof shows that Mr. Danner was on the scene several times during the drilling of the holes in the concrete and the laying of the floor and saw nothing improper in the way in which the floor was being laid and never made any objections, suggestions or comments to Mr. Jenkins, the subcontractor, to Mr. Worsham, the general contractor, or to Mr. Good; the architect, concerning the size of the holes being bored in the concrete or the manner in which the floor was being laid.

Mr. Worsham, president of Worsham Bros., Inc. which had the general contract for the Meigs County gymnasium, testified that at no time was the matter of tolerance as to the exact size of the ¼ inch drill bit mentioned by any of the parties interested in the Meigs County gymnasium contract and that he at no time made

any requirement of Mr. Jenkins as to the type or size drill bit to be used except he understood it was to be a ¼ inch drill bit.

Mr. Jenkins testified that his contract provided only for the laying of the floor in the gymnasium and did not cover the purchase of the hardwood flooring nor the materials for the Loxit system; that the plans and specifications called for the drilling of ¼ inch holes in the concrete and the insertion therein of lead anchors which were 1¼ inches long and ¼ inch in diameter; that since the concrete floor would not always be exactly level it was understood that the holes in the concrete floor would be from 1¼ inches to 1½ inches deep and the lead anchors inserted into the hole and a galvanized nail driven into the center of the lead anchors; that he had installed the Loxit system on three separate jobs prior to the Meigs County job but he had never bored the holes and driven the anchors prior to the Meigs County gymnasium contract.

Mr. Jenkins testified that he talked with Mr. Danner, the Knoxville, Tennessee, representative of the Loxit system, and got information from him concerning the system before he made his bid and that all the information referred only to a hole in the concrete ¼ inch in diameter; that he inquired of the C. M. McClung Company of Knoxville as to the probable cost of the ¼ inch bits necessary to be purchased and used in laying the floor before he made his bid; that McClung sold a ¼ inch carborundum tip bit requiring the use of no water as distinguished from a diamond tip bit requiring the use of water which was furnished by Knox-Tenn Equipment Company; that after he received the subcontract for

laying the floor he compared the prices of the carborundum bit from McClung and the diamond tip bit from Knox-Tenn and decided to buy from Mr. Alfrey.

At no time was any mention made by anyone to Mr. Jenkins concerning the required size of the drill bit except that it should be a ¼ inch bit. The difference in tolerance of a .262 drill bit and a .292 drill bit was never discussed or thought of by Mr. Jenkins. The only clearcut discrepancy between the testimony of Mr. Jenkins and the testimony of Mr. Alfrey is that Mr. Jenkins said he never used the sample drill bit before he ordered the other drill bits whereas Mr. Alfrey stated that Mr. Jenkins had bored about 400 holes with the first bit when he ordered the four additional bits. We do not find this discrepancy to be determinative but we find the preponderance of the evidence in favor of Mr. Alfrey's version.

After the floor buckled and it was found necessary to relay the floor Mr. Jenkins used carborundum tip ¼ inch drill bits purchased from McClung. These drill bits were measured by micrometer and showed tolerances from .262 to .268.

Also it is significant to note that Mr. Earl Worsham, president of Worsham Bros., Inc., general contractor, testified that after it became apparent that the floor had buckled to such an extent that it would have to be relaid, he conferred with Mr. Danner, the representative of the Loxit system, and with the architect. They decided to use longer and larger nails. At first Mr. Worsham was of opinion that they had not bored many new holes but had simply driven larger nails into the lead anchors in the old holes but upon reexamination and refreshing of his memory Mr. Worsham was of opinion that most of the

holes were rebored with the carborundum tip drill bits purchased from McClung and larger and longer nails were driven into the lead anchors.

Thus it is by no means certain from the proof before this court that Knox-Tenn will be held liable for the costs of relaying the gymnasium floor. Mr. Jenkins complied with specifications by using a ¼ inch bit. All the bits sold by Knox-Tenn were ¼ inch bits. Mr. Jenkins may well have been too precipitous in accepting responsibility to relay the floor.

All of the evidence in this cause was presented by the plaintiff. The defendant, Knox-Tenn Equipment Company, presented no evidence though, of course, the testimony of its officials, Mr. Cowan, president, and Mr. Alfrey, office manager and salesman, was presented by American Employers Insurance Company, Mr. Jenkins insists that Mr. Alfrey, sales manager, assured him that the ¼ inch diamond tip drill bits would do a satisfactory job of boring the holes and that he relied upon such assurances.

Regardless of whether Knox-Tenn Equipment Company was negligent in failing to learn the change in tolerance of the Longyear bit from .262 to .295 and regardless of whether Knox-Tenn Equipment Company is liable to Jenkins for breach of warranty of fitness under the common law or under the statute, we hold that the damage to the gymnasium floor was an accident as between American Employers Insurance Company and Knox-Tenn Equipment Company. Further, we hold that the plaintiff, American Employers Insurance Company, was obligated under its policy to defend the suit by Jenkins against Knox-Tenn Equipment Company and is

obligated to indemnify Knox-Tenn Equipment Company for all damages resulting from its failure to accept coverage under the policy. Such damages will include the payment of any judgment rendered against Knox-Tenn Equipment Company in favor of Jenkins if the recovery in favor of Jenkins is predicated upon the general theory that Knox-Tenn Equipment Company furnished bits to Jenkins which were too large and ultimately caused the floor to buckle.

Assignment of error No. IV is sustained, the other assignments of error are pretermitted, the judgment of the lower court will be reversed and a judgment entered in this court in accordance with the foregoing opinion. The costs in this court will be taxed against the American Employers Insurance Company.

Avery (P.J., W.S.), and Bejach, J., concur.

AVERY, (P.J., W.S.) (concurring).

I concur in this opinion for the reason that according to the proof adduced in this record there is evidence that would warrant the Court trying the suit for damages against Knox-Tenn Equipment Company by Jenkins, to submit the issue of whether or not the damage was the result of an "accident" as defined in the reported opinions of our Appellate Courts, and the American Employers Insurance Company can or could defend its assured with reservations so that it would not be liable under its insurance contract in event the defect in the floor was due to the negligence of the contractor Jenkins or that of his employees, or that if negligent, such negligence was of such contributory character as to constitute a part of the proximate cause of the buckling floor which resulted in the damage sought to be recovered.