**AERIAL AGRICULTURAL SERVICE OF MONTANA, INC., and Wilton Richard, Plaintiffs,**

v.

**Neill Hutchison TILL, Underwriter for Lloyd's, London, Defendant.**

**No. G–C–24–61.**

United States District Court
N. D. Mississippi,
Greenville Division.

June 15, 1962.

Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S.Ct. 468, 3 L. Ed.2d 368, 359 U.S. 962, 79 S.Ct. 795, 3 L.Ed.2d 769 (1959).

Keady, Campbell & DeLong, Greenville, Miss., for plaintiffs.

Wynn, Hafter, Lake & Tindall, Greenville, Miss., for defendant.

CLAYTON, District Judge.

This is a suit by Aerial Agricultural Service of Montana, Incorporated, and Wilton Richard against Underwriters at Lloyd's, London, represented in this cause by an underwriter who voluntarily appeared for the insurance carriers concerned with this litigation.

The case was tried to the court without a jury and submitted on briefs. Simply stated, the plaintiffs seek to recover upon a judgment previously obtained by Richard against Aerial Agricultural Service of Montana, Incorporated in this court (Aerial Agricultural Service of Montana, Inc. v. Richard (5 Cir. 1959), 264 F.2d 341) and the attorney's fees and costs of court and defense incurred in defending and appealing in that case. Richard seeks to collect on his judgment, while Aerial seeks to collect all of the expenses incurred in its defense and appeal.

For simplification, the corporate plaintiff will be referred to as "Aerial" and the defendant will be referred to as "Lloyd's".

Two basic issues are presented. They are (1) Aerial's right to use the courts of Mississippi, which Lloyd's by its motion to dismiss, claims Aerial cannot, and (2) whether coverage is afforded for the Richard claim and judgment and the expense of defense in that suit by the policy of insurance involved, which Lloyd's claims is not. Most of the material facts are without contradiction. Aerial is a corporation under the laws of the State of Montana and had engaged in aerial agricultural work in that state only until April, 1956. It has never qualified to do business in Mississippi. Lloyd's issued a policy of liability insurance in Oregon to Aerial as the named insured on March 14, 1956. Aerial's suit here is to enforce rights it claims under this policy.

In April of 1956, Aerial came into Mississippi and here engaged in work in keeping with the authorization of its corporate charter to the extent hereafter shown. Two or three of Aerial's regular employees came into the State of Mississippi about mid April, 1956, and remained here until May 14, 1956. Aerial employed one Cole (who had been engaged in aerial agricultural work, but who could no longer fly because of injuries) to solicit for it his former customer-farmers for aerial agricultural work. An advertising letter was sent out to Cole's customers in the Mississippi Delta area on Aerial's letterhead. This letter showed that Aerial maintained an office in Greenville, Mississippi; that Cole was Aerial's agent and that Aerial maintained a branch office in Hollandale, Mississippi. Aerial brought two of its airplanes and a pickup truck into this state and these planes performed, in six flying jobs, the work required by contracts which were made by Aerial, with four different farmers. The first flight was on April 27, 1956, and the last flight was made on May 10, 1956. Pilots regularly employed by Aerial flew Aerial's planes in doing this work. Aerial maintained and paid for telephone service in Mississippi and opened a bank account in this state on May 17, 1956, by depositing two checks totaling approximately $200.00. By May 18, 1956, all of its employees, its equipment and other property were withdrawn from Mississippi. Its gross income from these Mississippi flights did not exceed $500.00.

One of the jobs undertaken by Aerial in Mississippi was a rice seeding or planting operation for the plaintiff Richard. Several weeks after Aerial had withdrawn entirely from Mississippi, as the rice sowed by Aerial began to sprout and grow, Richard discovered that this work had been done improperly.

On September 13, 1956, Richard filed suit in this court against Aerial and on a trial on the merits, he obtained judgment. There was a vigorous defense by Aerial. An appeal was perfected to the Court of Appeals and the judgment of this court was affirmed. (Aerial Agricultural Service of Montana, Inc. v. Richard, supra.) This was a tort action and recovery was predicated upon a finding of negligence on the part of Aerial in the aforesaid seeding operation.

As Richard's claim, which gave rise to the aforementioned litigation, developed Aerial called on Lloyd's to service this claim under the aforementioned policy of insurance and demanded that Lloyd's defend the action when suit was filed. There were numerous conferences between Aerial and Lloyd's and voluminous correspondence between Aerial and its attorneys and Lloyd's and its agents and attorneys with reference to this claim, but the end result was that Lloyd's denied coverage and Aerial was compelled to "go it alone" in the defense and in the appeal from an adverse judgment in that case. Aerial's out of pocket expense, its obligation for attorney's fees and its liability for the judgment and court costs are substantial. Most of these items are still owed by Aerial.

In the case of Richard against Aerial, no question with respect to the failure of Aerial to qualify to do business under statutes of Mississippi so requiring [1] was

---

1. Section 5319, Mississippi Code of 1942, in 1956 (the time with which we are concerned) in its pertinent part read as follows:

"Every foreign corporation doing business in the State of Mississippi, whether it has been domesticated or simply authorized to do business within the State of Mississippi, shall file a written power of attorney designating the secretary of state or in lieu thereof an agent as above provided in this section, upon whom service of process may be had in the event of any suit against said corporation; and any foreign corporation doing business in the State of Mississippi shall file such written power of attorney before it shall be domesticated or authorized to do business in this state, and the secretary of state shall be allowed such fees therefor as are herein provided for designating resident agents. Any foreign corporation failing to comply with the above provision shall not be permitted to bring or maintain any action or suit in any of the courts of this state."

raised or considered by this court or by the Court of Appeals. However, in the case now before this court, Lloyd's strongly challenges the right of Aerial to use the courts of Mississippi for its claim presented here. Simply stated, it says that Aerial was doing business in the State of Mississippi at the time it undertook the seeding operation for Richard and that since Richard's claim arose from the doing of business in Mississippi by Aerial, at a time when Aerial had not complied with the aforementioned statute of Mississippi, then Aerial, under this statute, and the settled case law of Mississippi may not be permitted to use the courts of this state to sue on its part of the claim herein made against Lloyd's. Cited not only as supporting but as deciding conclusively this question in their favor are the cases of Perterman Construction and Supply Co. v. Blumenfeld, 156 Miss. 55, 125 So. 548; Newell Contracting Co. v. State Highway Commission, 195 Miss. 395, 15 So.2d 700; Marx and Bensdorf, Inc. v. First Joint Stock Land Bank, 178 Miss. 345, 173 So. 297 and Case v. Mills Novelty Company, 187 Miss. 673, 193 So. 625, 126 A.L.R. 1102.

■■ Accepting *arguendo* that Aerial was doing business in Mississippi within the meaning of Mississippi law, at the time when it undertook the seeding operation for Richard, that does not settle the question raised by the motion to dismiss. In each of the aforementioned cases, the suit was by a corporation to enforce rights it claimed under a contract made with a resident (or legal entity) of Mississippi at a time when the corporation was not qualified as required by Mississippi law. All of these contracts except one[2] were made in Mississippi. Each of these suits was against a resident contracting defendant—a party to the original contract made with the unqualified foreign corporation. The case here is basically different. Aerial sues to enforce rights it claims under a policy of insurance issued to it *in Oregon by Lloyd's before Aerial had done any business in the State of Mississippi.* Additionally, it must be noted that Richard's case against Aerial was in no wise dependent upon the existence of any contract between Aerial and Lloyd's. His case against Aerial was based on negligence which arose in the performance of a contract made between Richard and Aerial. His claim against Aerial became known or ripened some time *after Aerial had withdrawn from Mississippi entirely,* and suit was not filed thereon until approximately four months after such withdrawal.

"The validity of a contract of a foreign corporation which has not complied with statutory requirements is affected by such noncompliance only if the enacting state has jurisdiction over the contract or some feature thereof. Thus the fact that a foreign corporation is doing business in the state in violation of a statute requiring it to comply with certain requirements *does not ordinarily affect the validity of contracts made outside the state.*" 20 C.J.S. Corporations § 1856, page 78. (Emphasis added.)

The State of Mississippi had no jurisdiction over Aerial or Lloyd's when the policy being sued on here was issued by Lloyd's to Aerial in Oregon.

An Oregon corporation did business in Alaska without qualifying under Alaska law which provided that any noncomplying foreign corporation could not enforce its contracts. After it had ceased to do business in Alaska, it sued one Ohlsen on an old matter and recovered judgment. Attachment was sued out for his property for which forthcoming bond was executed by Protzman and Gordon payable to the United States Marshal conditioned for the redelivery of the attached goods or the payment of their value to the Marshal should the foreign

2. Case v. Mills Novelty Co., supra. But, there a machine sold by an Illinois corporation to a Mississippi resident for delivery and use in Mississippi was to be *serviced in this state.*

corporation recover judgment against Ohlsen. After judgment was recovered the Marshal assigned the forthcoming bond to the suing foreign corporation, Ross-Higgins Company, and it then filed suit against Protzman and Gordon. The defendants contended that the plaintiff could not recover as assignee because it had done business illegally in Alaska. The Circuit Court of Appeals for the Ninth Circuit (Ross-Higgins Company v. Protzman et al. (9 Cir. 1922), 278 F. 699) dealt with that defense in the following language:

"This being so, the assignee, *which was not engaged in business in Alaska at the time of the assignment, or at the time of the institution of the present action,* may enforce the obligation, and the court will not in this action permit the signers of the bond to inquire whether at the date of the notes involved in the action against Ohlsen the contract between him and the corporation was voidable for failure to comply with the statute cited, or whether, if Ohlsen had so elected in the action against him, the contract could have been held void as to the corporation. *Whatever violation of the law the corporation had been guilty of ceased before it became the assignee of the bond, and thereafter its attitude was that of a litigant foreign corporation not attempting to carry on business in Alaska.* Boggs v. Kelly M. Co., 76 Kan. 9, 90 Pac. 765, 15 L.R.A. (N.S.) 461; Booth & Co. v. Weigand, 28 Utah 372, 79 Pac. 576." (Emphasis added.)

Here Aerial is a foreign corporation not attempting to carry on business in Mississippi and was not doing any business in this state when Richard filed his suit against it.

In Long Beach Canning Company v. Clark, 141 Miss. 177, 106 So. 646, the Supreme Court of Mississippi upheld the right of a foreign corporation which had *done* business in Mississippi without complying with an earlier codification of § 5319, Mississippi Code 1942 (supra, note *1*) to use the courts of Mississippi to enforce its rights under a contract made for the sale of its property in Mississippi after it had discontinued doing business in the state and in Citizens' Bank of Hattiesburg v. Grigsby, 170 Miss. 655, 155 So. 684, the Supreme Court of Mississippi stated that this statute "was intended only to deny such foreign corporation access to the courts of the state to enforce rights growing out of business transacted contrary to the statute". The transaction of the business between Aerial and Lloyd's in Oregon cannot be said to be contrary to the statute.

The provisions of § 5344, Mississippi Code 1942 [3] must be borne in mind in this situation. By that statute, Aerial may sue in this state in its corporate name, but may not recover on any contract made in violation of law or public policy. The making of its contract of insurance with Lloyd's in Oregon before it ever came to the State of Mississippi for any purpose cannot be said to be in violation of law or against the public policy of this state since this contract, at the time of its making, was a matter over which the State of Mississippi then had no jurisdiction. Aerial thus has the right to use the courts of Mississippi to settle this controversy with Lloyd's, and the motion to dismiss is not well taken.

**3.** "Corporations which exist by the laws of any other state of the Union, by the acts of congress, or the laws of any foreign country, may sue in this state by their corporate names, and they shall also be liable to be sued or proceeded against, by attachment or otherwise, as individual non-resident debtors may be sued or proceeded against. And the acts of the agents or any such foreign corporation shall have the same force and validity as the acts of agents of private persons; but such foreign corporations shall not do or commit any act in this state contrary to the laws or policy thereof, and shall not be allowed to recover on any contract made in violation of law or public policy."

Disposition of the second question, which is whether coverage is afforded by the policy or not, requires a statement of the substance of the factual situation which was the basis of recovery by Richard against Aerial. With seeders used in planting by air the speed of the aircraft and the current of air generated by the spinning propeller (commonly called "prop wash") force the seed out of the hopper through a mechanism designed to distribute the seed evenly. Aerial constructed a seeder of its own design which was used in the rice seeding operations that Aerial undertook for Richard. This seeder had its vanes two inches off center and two inches more curve on the right than on the left of the vanes, apparently in an effort to compensate for torque. It was noticed during the seeding operations that the aircraft was trailing seed on its turns. Upon investigation, it was determined that the hopper door on the seeder was jammed with chaff and trash and it had to be cleaned in order to continue the operation. This seeder was used for planting rice on the Richard property for the first time. Before that it had been tested by only one distribution of 300 pounds of oats. In passing on the matter, this court said: "Whether the seeder was defective and caused the improper distribution or not, it is very clear from the evidence now before the court that the seeding operation was *improperly* done, and resulted in delivery of an uneven distribution of seed, clearly too thick on one side of the swath and clearly too thin on the other side, with some bare spots where no seed germinated." The basis of Aerial's liability was the negligent distribution of the rice seed.

██ The policy insuring agreements are "to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages * * * because of injury to or destruction of property, including consequential damages and loss of use thereof," caused by an *occurrence* and arising out of the aircraft described in and used for the declared purposes. In addition to the basic insuring agreement, the policy contains obligations to defend any suit against the insured alleging such injury or destruction and seeking damages on account thereof; to pay all expenses incurred and all costs taxed against the insured in any such suit and all interest accruing after entry of judgment and, to reimburse the insured for all reasonable expenses other than loss of earnings, incurred at the insurer's request. The purposes for which the insured aircraft could be used under the policy, among others, were aerial application of dusts, *seed*, and sprays.

Lloyd's concedes that none of the exclusions set out in the policy are applicable to this situation and the main battle is joined on the proper interpretation to be placed upon a part of the policy under the heading "Conditions" wherein the word *"occurrence"* is defined in these words:

"(b) Occurrence—The word 'occurrence' as used in this policy means either:

"(1) An accident, including a series of related accidents with a common proximate cause; or

"(2) A condition created by the insured which during the policy period accidentally causes injury or destruction provided that such condition, injury or destruction is not caused by accident."

Lloyd's vigorously contends that since Aerial affixed the seeder of its own design to the airplane and adjusted it and since the seeder and the airplane improperly distributed the rice seed causing damage to Richard, that in contemplation of the policy, Aerial did what Aerial intended to do in this regard since the seeder did not become accidentally attached to the airplane and its design and adjustment were not accidental. Lloyd's contends that since it is now beyond dispute that Aerial was negligent, and that "negligence" and "accident" are mutually exclusive that, therefore, the policy does not cover the situation with which we are confronted here.

Cited to support this view are Hardware Mutual Casualty Co. v. Gerrits, Fla., 65 So.2d 69; Bennett v. Fidelity & C. Co. of N. Y., Fla.App., 132 So.2d 788, 791; Mauney v. Gulf Refining Co., 193 Miss. 421, 8 So.2d 249, 9 So.2d 780; Thomason v. United States F&G Co. (5 Cir. 1957), 248 F.2d 417; Neale Construction Co. v. United States F&G Co. (10 Cir. 1952), 199 F.2d 591; Womack v. Employers Mutual Liability Insurance Co. of Wisconsin, 233 Miss. 110, 101 So.2d 107. Cf. Great American Insurance Co. v. Triplett, Miss., 139 So.2d 357.

Apparently, Lloyd's contends for a purist's definition of "accident" and "accidentally" which in their proper or technical meaning would exclude negligence; that is to say that an accident is an event which occurs without fault, carelessness or negligence on the part of anyone; one which would have been avoided by the use of that degree of care required by the circumstances. However, this position may not be maintained since this would be to say that the policy in question affords no coverage at all to Aerial and to say that both Lloyd's and Aerial so intended.

In Womack, supra, upon which Lloyd's places great reliance, Womack, a garage man, placed intake valves where exhaust valves should have been, in repairing a motor. The owner of the motor sued Womack for damages. Womack notified his liability insurance carrier and it denied coverage and refused to defend. In disposing of Womack's suit against the carrier, the Supreme Court of Mississippi, among other things, said the following:

"* * * Here, at most, Womack was guilty only of defective workmanship which resulted in money damage to Latta."

\* \* \* \* \* \*

"In the case at bar Womack *intended* to make the repairs upon Latta's motor vehicle and *in the very manner in which the work was done*. There was nothing *unintended or undesigned* involved in Wo-

mack's actions." (Emphasis added.)

The policy there insured against liability *"caused by accident"*. The insuring language here is different, and broader, and it cannot be said that Aerial intended to distribute the rice seed in the very manner in which this was done, or that the faulty distribution was intended and designed. The construction of the language of liability policies was involved in three of these aforementioned cases, but the language of the policy in question was either "caused by accident" or, "accident". None of these cases dealt with a liability insurance policy wh: provided coverage for an "occurrence" as defined in the policy issued to Aerial by Lloyd's. Counsel have cited no case and none has been found in which the language with which we are now concerned was construed. Hence, as it seems, new ground must be plowed by this court in disposing of this question.

A case of striking similarity on the facts is Labberton v. General Casualty Company of America, 53 Wash.2d 180, 332 P.2d 250, decided in 1958 by the Supreme Court of Washington. The insured sold fertilizer to a farmer and supplied him with an apparatus with which to apply the fertilizer to his wheat land. Because of a defect in the apparatus, only a portion of the wheat land was fertilized, with the crop yield being accordingly diminished. When the insured was threatened with suit for damages, the insurer was tendered the defense which it rejected on the ground that the farmer's loss was not within the coverage afforded by the policy. Thereafter, the farmer's claim was settled by the insured on the payment of a reasonable amount, and the insured brought suit against the insurer to cover its outlay. The policy as originally issued obligated the insurer to pay such sums "which the Insured shall become legally obligated to pay * * * for damages because of injury to or destruction of property, including the loss of use thereof, caused by accident". The word "*occurrence*" was substituted by a subse-

quent rider for the word "accident". The court held that there was coverage, that an occurrence had transpired, and that the insurer was liable. A number of cases from other courts are cited in this opinion which are highly persuasive of the view this court takes in the case at bar.

As will be demonstrated, the insuring language with which we are primarily concerned is confusing in its meaning and thus ambiguous. In this situation, the general rules of almost universal application for the construction of language in insurance policies come into play. In recognition of the fact that insurance policies are almost always prepared completely by the insurer and that the insured has little, if any, voice in their preparation, such contracts are to be strictly construed against the insurer and liberally construed in favor of the insured so that ambiguous words will be interpreted against the insurer to extend or broaden coverage and so a policy susceptible of two reasonable interpretations will be construed favorably to the insured. That is the law in Mississippi. Williams v. Reserve Life Insurance Co., 223 Miss. 698, 78 So.2d 794; Firemans Fund Insurance Company v. McDaniel, 187 F.Supp. 614, (aff. (5 Cir. 1961), 289 F.2d 926) and American Fidelity and Casualty Co. v. St. Paul Mercury Indemnity Co. (5 Cir. 1957), 248 F.2d 509.

This rule is the same in Oregon, the state where the insurance policy was issued. The policy should be construed liberally in favor of the insured and strictly against the insurer. Schoeneman v. Hartford Fire Insurance Co., 125 Or. 571, 267 P. 815. Insurance contracts which are susceptible to two reasonable constructions will be construed favorably to the insured, with ambiguities resolved against the insurer. Zurich General Accident & Liability Insurance Co. v. Carlton & C. R. Co., 133 Or. 398, 291 P. 349; Zimmerman v. Union Automobile Insurance Co., 133 Or. 600, 291 P. 495 and Clark Motor Co. v. United Pa-

cific Insurance Co., 172 Or. 145, 139 P.2d 570.

It has been said that language in insurance contracts is to be construed according to its usual and ordinary meaning so that a person of ordinary intelligence can understand "that a particular hazard is not covered". Underwriters at Lloyd's, London v. Cordova Airlines, Inc. (9 Cir. 1960), 283 F.2d 659. It has also been said in a case involving aircraft coverage that "what controls is not the interpretation of individual words which are not defined in the policy itself, but the interpretation which the ordinary man would give to the phrase as a whole taken in the context of the whole policy and the average man's knowledge of the way insurance is set up". Prudential Insurance Co. of America v. Barnes (9 Cir. 1960), 285 F.2d 299. And, where "the critical words [of an insurance policy] are ambiguous to the lay mind, 'the insurer may not escape liability merely because his or its interpretation should appear to us a more likely reflection of the intent of the parties than the interpretation urged by the insured. The latter has to be no more than one which is not itself unreasonable' ". Thomas v. Continental Casualty Co. (10 Cir. 1955), 225 F.2d 798.

Applying these aforementioned rules of construction to the insuring language here involved, it is at once apparent that to confine this language to the narrow definitions applied to policies which limit coverage to injury "caused by accident" or "accident" will not suffice.

To adopt the view of Lloyd's would be to obliterate the second definition and apply, in its narrowest sense, only the definition first stated in the policy. This would ascribe to the second definition no meaning at all. These words, however, must be given meaning in accordance with the principles of construction aforementioned. To begin with, the word "occurrence", to the lay mind, as well as to the judicial mind, has a meaning much broader than the word "accident". As these words are generally understood, accident means something that

must have come about or happened in a certain way, while occurrence means something that happened or came about in any way. Thus *accident* is a special type of *occurrence*, but occurrence goes beyond such special confines and, while including accident, it encompasses many other situations as well.

In an attempt to determine the plain meaning of these aforementioned defining words in this policy in a grammatical sense, this ambiguity is demonstrated: "A condition created by the insured * * * provided that such condition * * * is not caused by accident." It is necessary that such condition "accidentally causes injury or destruction" with the further limitation that the injury or destruction is not caused by accident. The proviso clause "that such condition, injury or destruction is not caused by accident" relates to the "condition", to the "injury", or to the "destruction". It probably would be grammatically correct to say that "occurrence" includes a condition created by the insured which is not caused by accident and which results in injury or destruction which is not caused by accident, leaving the word "accidentally" to modify the verb "causes" as "accidentally causes". From a grammatical standpoint, the condition created by the insured and the injury or destruction are not necessarily related to "accident". It is, therefore, proper to work out a reasoned meaning of the word "accidentally" in the context in which it appears.

To seek a reasoned meaning of the word "accidentally", acceptable to both the lay mind and the judicial mind, Webster's New International Dictionary, Second Edition, does not have a definition of the adverb accidentally, but the definition therein of "accidental", the adjective, is:

Accidental: "1. Happening by chance, or unexpectedly or not according to the usual course of things; casual, fortuitous; as, an accidental visit."

"Undesigned" and "unintended" are synonyms of accidental, while "purposed" and "intentional" are antonyms.

It would, therefore, seem that from the usual and ordinary meaning of the words used the word "occurrence" extends to events included within the term "accident" and also to such conditions, not caused by accident, which may produce an injury not purposely or deliberately. To say it differently, in the context in which it is used, the word "accidentally" means "unintentionally", "undesigned" or not deliberately. To say otherwise would give rise to a paradox: "Accidentally causes injury provided such injury is not caused by accident." Plainly, "accidentally causes injury" is limited, perhaps contradicted, by "provided such injury is not caused by accident". To avoid running into a nonsensical maze caused by inept draftsmanship, it is necessary to say that the ambiguities of this policy definition must be resolved to give to the language used a fair meaning. When this is done, "accidentally causes injury" must be read to mean unintentional injuries. Consistent with this view, if the injuries were the unintentional result of a condition created by Aerial "not caused by accident" then the injuries themselves would be "not caused by accident" within the meaning of this policy.

With respect to part (1) it is obvious that "accident" is not something wilfully or deliberately caused. If part (2) is literally meant to refer to some condition or damage accidentally caused, but not caused by accident, then the words are nonsense; but, if part (2) means a condition created by the insured, but not by accident, which causes some unintentional injury or damage, then common sense emerges from the apparent nonsense and there is meaning and purpose in the definition. In this light, part (2) simply includes injury or damage unintentionally ("accidentally") caused by a condition intentionally ("not by accident") brought about ("created") by the insured.

To summarize: The draftsman of the language in question intentionally, or "accidentally" (i. e. "unintentionally") broadened the language in this definition

of "occurrence" by part (2) to extend the coverage afforded by this policy beyond the limits which would have been described by a definition limiting coverage only to injury "caused by accident" or resulting from "accident". This language includes coverage for injury caused from a condition intentionally created which unintentionally causes injury. And this is without regard to negligence on the part of the insured *after* the creation of the condition from which the unintentional injuries flowed.

Simply stated, Aerial intentionally created the condition which gave rise to the uneven distribution of rice seed, but the poor, uneven distribution of the seed was unintended. Such distribution was "accidentally caused" within the meaning of the policy. See New York Life Insurance Co. v. Harrington (9 Cir. 1962), 299 F.2d 803.

Strength and vitality are given to the meaning ascribed to the questioned language when this court judicially notes that common usage of ordinary people in everyday conversation is to use interchangeably and indistinguishably the words "accidentally" and "unintentionally". Such expressions as those following are often heard:

"I accidentally cut my finger."

"I accidentally opened your letter."

"I accidentally spilled my drink on your floor."

"I accidentally locked myself out of my house."

"I accidentally drove through a red light."

"I accidentally drove too fast."

Lloyd's also contends that the damages suffered by Richard, for which he recovered judgment against Aerial, are not "injury to or destruction of property, including consequential damage and loss of use thereof" within the meaning of this policy. But this just will not do. It does not require the citation of any authority to say that Richard's rights to the rice seed sowed by Aerial and to the crop which was to result from this seeding operation, and which did result from this seeding operation (although of substandard yield) were property. Many definitions of property as a legal term are included in 73 C.J.S. Property § 1, pages 135–149. A collection of many of the authoritative definitions is included in the case of Labberton v. General Casualty Company of America, supra. Other than this suffice it now to say that unquestionably Richard's "property, including consequential damage and loss of use thereof" was damaged by Aerial when they made an improper distribution of rice seed on his crop land.

In the light of what has thus far been said, it remains only to conclude that both Aerial and Richard are entitled to recover in accordance with their respective claims made in their joint complaint. Judgment will be awarded against Lloyd's for the full amount of the judgment heretofore obtained by Richard against Aerial in this court, with interest thereon at the legal rate from the date of its entry in this court, and costs properly taxable in favor of Richard in that case in this court and in the Court of Appeals, with interest on such costs at the legal rate from the date said costs were properly taxable; and, for the counsel fees necessarily incurred by Aerial in the preparation for trial and trial in this court, for the prosecution of the appeal from the judgment in this court to the Court of Appeals, together with all necessary expenses incurred in connection with that litigation, with interest thereon at the legal rate from the date of the entry of judgment in this cause.

All of the aforementioned items are in evidence in this case without contradiction and are found to be reasonable and proper. Mathematical calculation of these amounts will be made by counsel who will settle the form of the order and present it for entry.