**ST. PAUL FIRE AND MARINE INSUR-
ANCE COMPANY, Appellant,**

v.

**NORTHERN GRAIN COMPANY et al.,
Appellee.**

**No. 18295.**

United States Court of Appeals
Eighth Circuit.

Aug. 17, 1966.

362

Holton Davenport, of Davenport, Evans, Hurwitz & Smith, Sioux Falls, S. D., for appellant. Lyle J. Wirt and Deming Smith of the same firm, Sioux Falls, S. D., were with him on the brief.

Francis M. Smith, of Woods, Fuller, Shultz & Smith, Sioux Falls, S. D., for appellee, Northern Grain Co. Melvin T. Woods, Howell L. Fuller and John B. Shultz of the same firm, Sioux Falls, S. D., were with him on the brief.

Before VOGEL, Chief Judge, and MATTHES and MEHAFFY, Circuit Judges.

MATTHES, Circuit Judge.

This declaratory judgment action was instituted by Northern Grain Company, a corporation organized under the laws of South Dakota, against St. Paul Fire and Marine Insurance Company, a Minnesota corporation.[1] Plaintiff, hereinafter referred to as Northern, prayed for a judgment declaring that it was insured under two insurance policies issued by defendant, hereinafter designated as St. Paul or appellant, against the legal liability of Northern growing out of the sale of the wrong type of seed wheat to third parties during the months of April and May, 1962, that St. Paul be required to defend Northern in any actions which may be instituted by third parties, and be required to pay any and all judgments recovered by third parties.

The facts were undisputed and appear from the stipulation on which the cause was submitted.

Northern was engaged in the business of buying, selling and storing grain. St. Paul issued a Comprehensive General Liability Policy effective from May 15, 1961 to May 15, 1962, hereinafter referred to as Policy A, and a similar policy effective from May 15, 1962 to May 15, 1963, hereinafter referred to as Policy B.

Each policy insured Northern against liability arising out of Northern's operation of a grain elevator, with express coverage of liability hazards of products and completed operations. Under the insuring agreement of the policies St. Paul agreed:

> "To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of injury to or destruction of property, * * *, caused by accident."

Under "Conditions" relating to "Limits of Liability—Aggregate Products," Policy A provided:

> "The limits of * * * property damage liability stated in the declarations [$50,000.00] as 'aggregate products' are * * * the total limits of the Company's liability for all damages arising out of the handling or use of or the existence of any condition in goods or products manufactured, sold, handled or distributed by the Insured * * * when the occurrence or accident takes place away from premises owned, rented or controlled by the Insured and after the Insured has relinquished possession of such goods or products to others * * *."

Policy B under "Conditions" provided that "The term 'products hazard' means:

> "(1) goods or products manufactured, sold, handled or distributed by the named Insured * * *, if the accident or occurrence occurs after possession of such goods or products has been relinquished to others by the named Insured * * * and if such accident or occurrence occurs away from premises owned, rented or controlled by the named Insured * * *."

Both A and B excluded coverage

> "to injury to or destruction of * * * (3) any goods, products or containers thereof manufactured, sold, handled or distributed by the Insured, * * * out of which the occurrence or accident arises * * *."

On or about April 1, 1962, Northern accepted for storage in its elevator about 3,000 bushels of wheat, described by the producer as Selkirk wheat. During April and May, 1962, Northern sold and delivered to its customers 2,222 bushels of what was believed to be Selkirk seed wheat. In fact, the seed wheat acquired and sold by Northern was Conley wheat. A germination test by Northern failed to reveal the variety of wheat which it had acquired and sold. A distinguishing factor between the two types of wheat is that Conley has "bearded" heads while Selkirk does not. This characteristic of Conley wheat is not detectable until the wheat heads appear. Thus discovery of the type of wheat actually sold by North-

1. Authority for seeking declaration of rights is 28 U.S.C.A. § 2201 (1959).

ern was not made until the latter part of June, 1962.

Claims were made upon Northern by the purchasers of the seed wheat on the theory that Conley wheat is less productive than Selkirk wheat to the extent of seven or eight bushels per acre, and that as a consequence, they suffered damages of diminution in the value of their wheat crop. The claims totaled $33,000.00. Some of these claims, amounting to over $12,000.00, were tendered to St. Paul, who took the position that the claimed losses were not covered by the policies.

Subsequent to the filing of the stipulation, on motion of St. Paul, the prospective claimants, twenty-five in number and all citizens of South Dakota, were added as parties and aligned as plaintiffs. They were duly summoned, appeared by counsel, participated in the proceedings, and with Northern, are appellees here.

In its "Notice of Decision" the district court found, principally on the authority of Dakota Block Company v. Western Casualty & Surety Company, 132 N.W.2d 826 (S.D.1965) and Hauenstein v. Saint Paul-Mercury Indem. Co., 242 Minn. 354, 65 N.W.2d 122 (1954), that Northern and the added parties were entitled to a judgment declaring that the liability of Northern to the added parties was covered by the policies.

The court made additional findings of fact to the effect that if loss was suffered by the added parties, it was an unexpected and unforeseen happening and was an "accident" within the meaning of that term as used within the insuring agreement of the policies; that if any loss was sustained by an added party, the accident occurred at a place other than "premises owned, rented or controlled" by Northern, and after Northern had "relinquished possession" of the seed wheat; that if any loss was sustained by an added party, it was damage to the wheat crop rather than to the seed wheat, and in consequence, insurance coverage was not excluded under the clause excluding coverage for damages to "any goods, products or containers thereof

manufactured, sold, handled or distributed by the Insured * * *." The court expressly refrained from determining whether the damages claimed by the added parties were in fact sustained. The judgment, from which St. Paul has appealed, merely adjudged that the policies insured Northern against its legal liability to the added parties for damages they may have sustained as a result of the purchase of Conley seed wheat under the facts and circumstances set forth in the court's findings. The judgment also required St. Paul to defend Northern in any suits instituted by added parties and to pay any judgment rendered against Northern within the applicable limits of coverage set forth in the policies.

The numerous points advanced by appellant in support of its broad assertion of no coverage are reduced, for purposes of this opinion, to these basic contentions: one, there was no "accident" within the meaning of that term as it is used in the policy; two, the damages, if any, sustained by added parties are not the consequence of an "injury to or destruction of property" as that clause is used in the insuring agreement.

■ The cases do not support the claim of no accident; indeed a wealth of authority sustains the conclusion that an accident occurred. This court has recognized that the word "accident" has never acquired any technical signification in law, and when used in insurance contracts, it is to be construed and considered according to the ordinary understanding and common usage of people generally. American Cas. Co. of Reading, Pa. v. Minnesota F. B. S. Co., 270 F. 2d 686, 690–691 (8th Cir. 1959), where we quoted at length from 29 Am.Jur., Insurance, § 931 (1940) (now 29A Am. Jur. § 1164) (1960). The same authority announces further " * * * the courts are practically agreed that the words 'accident' and 'accidental' mean that which happens by chance or fortuitously, without intention or design, and which is unexpected, unusual and unforeseen." 29A Am.Jur., Insurance, § 1164

(1960). 7A Appleman, Insurance Law and Practice, § 4492 states: "When used without restriction or qualification in insurance contracts, the term 'accident' has been held broader than the restricted definition of an event happening suddenly and violently." Reference to a relatively limited number of cases will suffice to demonstrate that courts have interpreted and applied the term "accident," as used in general liability insurance policies, broadly, and have declined to limit its meaning to an event which happened suddenly and violently. See, e. g., Koehring Company v. American Automobile Insurance Co., 353 F.2d 993 (7th Cir. 1965), breakdown of hydraulic cylinders of cement mixers constituted an accident; Geddes & Smith, Inc. v. Saint Paul-Mercury Indem. Co., 51 Cal. 2d 558, 334 P.2d 881 (1951), defects in aluminum doors which developed after they were installed held to constitute an accident; Ritchie v. Anchor Casualty Company, 135 Cal.App.2d 245, 286 P.2d 1000 (Cal.Ct.App.1955), damages arising from the use of rancid oil held to be caused by accident; Shelby Mutual Ins. Co. v. Ferber Sheet Metal Works, 156 So. 2d 748 (Fla.Ct.App.1963), damage to church organ eight months after completion of roofing and waterproofing work because of deficiencies in such work was an accident; Hauenstein v. Saint Paul-Mercury Indem. Co., 242 Minn. 354, 65 N.W.2d 122 (1954), an oft-cited case, holding that property damage to buildings caused by application of defective plaster was caused by accident; Penley v. Gulf Insurance Co., 414 P.2d 305 (Okl. 1966), damage to motor truck resulting from improper use of gasoline instead of diesel fuel held to constitute accident; Dakota Block Co. v. Western Casualty & Surety Co., 132 N.W.2d 826 (S.D.1965), fading, discoloring and cracking of exterior walls that had been made of haydite concrete blocks constituted an accident; American Employers Ins. Co. v. Knox-Tenn. Equip Co., 52 Tenn.App. 643, 377 S.W.2d 573 (1964), damage to floor as result of use of improperly sized drill bits held to be the result of accident.

■ In light of the broad and liberal judicial interpretation of the term "accident" as used in general liability policies, particularly in a policy which, as is true here, insures against "Products Hazard," we are of the firm view, and so hold, that the occurrence under consideration satisfies the requirement that the claimed damages were caused by accident. The result flowing from the sale of the improper seed wheat was an unexpected, unforeseen and fortuitous event. Moreover, it seems clear that inasmuch as the "accident" here occurred when the damage to the wheat crop of Northern's customers appeared, any reimbursement of the ultimate loss sustained by Northern is determined under the coverage provisions of Policy B.[2]

■ We turn now to the more troublesome aspect of this case, i. e., whether the diminution in the yield of the wheat crop constituted "damages because of injury to or destruction of property including the loss of use thereof, * * *" within the meaning of that clause as used in the insuring agreement.

Appellant strongly urges that property damage liability coverage under the policies be predicated upon an "injury to or destruction of property," and that merely a mistake by Northern in selling a wheat seed less productive than that ordered does not constitute such "injury to or destruction of property" within the meaning of the insuring agreement. In support of its contention appellant cites numerous cases standing for the proposition that the above quoted language comprehends physical damage to some tangible property other than "goods, products or containers thereof manufactured, sold, handled or distributed by the Insured * * *." See, e. g., Pittsburgh Plate Glass Co. v. Fidelity Casualty Co. of N. Y., 281 F.2d 538 (3d Cir. 1960); Geddes & Smith v. Saint Paul-Mercury Indem. Co., 51 Cal.2d 558, 334 P.2d 881

2. We note in passing, however, that under our view of the applicable law in this case, specific reference to Policy B to the exclusion of Policy A is not required, since the insuring agreement is the same under both policies.

(1959); Hauenstein v. Saint Paul-Mercury Indem. Co., 242 Minn. 354, 65 N.W. 2d 122 (1954).

We agree that the cases relied upon by appellant predicate recovery upon an "injury to or destruction of property" other than the goods or products of the insured. We do not believe, however, that these cases establish a rule which invariably limits recovery to detectable physical damage which may result to other tangible property from contact with the goods or products of the insured. On the contrary, the cases squarely recognize that consequential damages, including the diminution in value of property, caused by the use or application of a deficient or inferior product, fall within the coverage provisions of an insuring agreement such as that in the case at hand.

In Hauenstein v. Saint Paul-Mercury Indem. Co., supra, the Supreme Court of Minnesota allowed recovery under an identical insuring agreement for the reduction in the market value of a building caused by the application of a defective plaster product. The court concluded that the mere presence of the defective plaster on the walls and ceilings reduced the market value of the building and thereby constituted property damage within the policy, though no visible, physical injury otherwise resulted to the building.

So also in Dakota Block Co. v. Western Casualty & Surety Co., 132 N.W.2d 826 (S.D.1965), recovery was predicated upon the diminished market value of a building as the result of the use of discolored and faded exterior blocks, despite the absence of any other detectable physical damage.

In Pittsburgh Plate Glass Co. v. Fidelity Casualty Co. of N. Y., supra, paint flaked and peeled off of venetian blinds, thus causing a rapid deterioration of the bare metal surfaces and necessitating removal of the blinds, stripping and repainting of the finished product. Recovery from Pittsburgh's liability insurer was limited to damages occasioned to the finished product. The case, however, turned upon the specific language of the insuring agreement which limited derivative liability to "damages because of physical injury to or physical diminution of tangible property."

While other cases [3] in point and some of those cited by appellant do involve the question of coverage of detectable physical damage ensuing as the result of contact with a defective and inferior product of the insured, we nevertheless regard the *Hauenstein* and *Dakota Block* cases as establishing the principle that consequential *or intangible* damages, in addition to direct physical damage to other property, are comprehended within the terms of the *immediate insuring* agreement.

Just as the diminution in value of the buildings in *Hauenstein* and *Dakota Block* constituted property damage within the ambit of the insuring agreement, so also does the diminution in the productivity of the wheat crop, as the result of an inferior and deficient quality of seed wheat, constitute property damage within the coverage of this policy. The crops raised by Northern's customers were no less physical properties than the buildings in *Hauenstein* and *Dakota Block*.

Particularly apropos is the case of Labberton v. General Casualty Co. of America, 53 Wash.2d 180, 332 P.2d 250 (1958). There the insured sold fertilizer to a farmer and also supplied him with an apparatus with which to apply

3. See, e. g., Penley Oil Co. v. Gulf Insurance Co., 414 P.2d 305 (Okl.1965) (damage to diesel motor as the result of the mistaken loading of gasoline instead of diesel fuel into customer's road grader held to be within policy coverage); Shelby Mutual Ins. Co. v. Ferber Sheet Metal Works, 156 So.2d 748 (Fla.Ct.App.1963) (water damage occasioned to church organ as the result of a defectively installed roof held to be within coverage of identical insuring agreement); see also Bundy Tubing Co. v. Royal Indemnity Company, 298 F.2d 151 (6th Cir. 1962) (insuring agreement held to encompass manufacturer's liability for the cost of replacement of defective tubing installed in concrete floors in basementless houses, which failed to function as warranted, and also installation of new tubing).

the fertilizer to wheat land. As a result of a defect in the apparatus, only a portion of the farmer's land was fertilized with a consequent diminution in the farmer's wheat yield. There, as here, plaintiff's liability insurer denied coverage under an almost identical insuring agreement[4] and insisted that there was no damage because of injury to property within the meaning of the insuring clause. The Supreme Court of Washington disagreed and held the damages sustained as the result of a less productive wheat crop to be within the scope of policy coverage. Of significance was the court's refusal to ascribe a technical or narrow meaning to the term "property" as encompassing only physical and tangible property. The term encompassed a much wider connotation for the Washington Supreme Court, embracing not only intangible property but also the use and enjoyment of physical property as well.

Of similar import is Aerial Agricultural Service of Montana, Inc. v. Till, 207 F.Supp. 50 (N.D.Miss.1962),[5] holding that a diminished and substandard rice crop as the result of an improper aerial seeding operation was an injury to property within the meaning of the insuring agreement.

■ The reasoning employed in *Labberton* and *Till* is persuasive. We are not inclined to adopt a narrow construction of the term "property," especially in view of the fact that it is used without limitation. St. Paul could have explicitly excluded such consequential products liability, if it had so chosen, by reference to specific language in the insuring agreement.[6] Having failed to do so, and thus having created a situation where the term "property" has become susceptible to different construc-

tions, an interpretation most favorable to the insured should be the one adopted. Hartford Accident and Indem. Co. v. Kuipers Construction Co., 327 F.2d 333 (8th Cir. 1964). If the policy had intended to exclude diminution in value as the result of an inferior and deficient product from the area of permissible coverage, it should have explicitly so provided. As it stands, explicit coverage of the present factual situation is, at best, ambiguous. Such ambiguity must, of course, be resolved in favor of the insured. Ibid.

■ Nor do we agree with appellant's contention that the holding of the California Supreme Court in Geddes & Smith, Inc. v. Saint Paul-Mercury Indem. Co., 51 Cal.2d 558, 334 P.2d 881 (1959) requires a different result than the one we have reached. There a building contractor sued for damages resulting from the use of defective aluminum doors supplied by a manufacturer. The court limited coverage under the insuring agreement to the cost of removal of the doors and the loss of use of the houses. In light of the insuring agreement and applicable exclusions, the court construed the term "property" as embracing solely physical or tangible property, and not the loss of good will and business profits as the insured had contended. While the basic coverage provision was identical to the one at bar, it must be read in the light of an exclusion of products liability, which, though later cancelled, affected interpretation of the basic coverage provision. Moreover, although the court uses language which seems to exclude intangibles from the concept of "property" as used within the insuring agreement, it, in fact, excises from coverage only those items of damage affecting the *insured's* business and good

---

4. By a subsequent rider to the policy, the word "occurrence" was substituted for the word "accident," but the two terms were construed interchangeably.

5. The insuring agreement in *Till* closely parallels that found in *Labberton* and in the present case with the exception that the insuring agreement specifically includ-

ed consequential damages within the policy coverage.

6. See, for example, the language of the insuring agreement in Pittsburgh Plate Glass Co. v. Fidelity & Casualty Co. of N. Y., supra, where liability for consequential or intangible property was specifically excluded by the insuring agreement.

will. Such damage would necessarily fall within the exclusionary clause. The *Geddes & Smith* reasoning, affecting only damage for loss of profits of the *insured,* should not be extended to cover damage for loss of profits of Northern's *customers* from an inferior wheat crop.

Finally, St. Paul contends that irrespective of any "injury to * * * property" which may conceivably exist, coverage is nevertheless precluded under the exclusion of "injury to or destruction of * * * (3) any goods, products or containers thereof manufactured, sold, handled or distributed by the *Insured* * * *." Thus St. Paul equates the wheat crop of Northern's customers with the seed wheat sold by Northern, and refuses to recognize a distinct and separate identity between the two.

We refuse to accede to the argument that the wheat crop was merely the seed in changed form and therefore encompassed within the exclusionary clause. By virtue of the germination process involved in the production of wheat a transformation did, in fact, occur so as to constitute the wheat crop a separate and distinct entity from the original seed wheat.

Considered in its proper perspective, the function of the exclusionary clause denying coverage of damages for "injury to or destruction of * * * any goods, products or containers thereof manufactured, sold, handled or distributed by the *Insured* * * *" is clear. Such a provision denies coverage to an insured for damages occasioned to his own goods or work product by reason of its internal defectiveness. The exclusionary clause, however, has no reference to damage to property other than the insured's goods or products or other accidental loss resulting from the defective condition of the insured's work product. Bundy Tubing Company v. Royal Indemnity Co., 298 F.2d 151 (6th Cir. 1962); Vobill Homes, Inc. v. Hartford Accident & Indem. Co., 179 So.2d 496 (La.Ct.App.1965); Kendall Plumbing, Inc. v. St. Paul-Mercury Ins. Co., 189 Kan. 528, 370 P.2d 396 (1962).

In the final analysis, involved here are questions of local (South Dakota) law. Because it is not our task to "formulate the legal mind of the state, but merely to ascertain and apply it," Village of Brooten v. Cudahy Packing Co., 291 F.2d 284, 288 (8th Cir. 1961), we have the usual problem of endeavoring to determine what the Supreme Court of South Dakota would, on the facts before us, declare the law of that state to be. Although we have exercised our independent judgment in resolving the questions presented, we are mindful that the views of the district court, while of course not conclusive, are entitled to consideration. That court was persuaded to hold, on the basis of the decision of the Supreme Court of South Dakota in its recent case of *Dakota Block Co.,* supra, that the claimed damages in this case are covered by one or both of the policies issued by St. Paul. We are satisfied that the district court's decision was a permissible one, and we therefore affirm.