**FOOTE MINERAL COMPANY, Plaintiff,**

v.

**MARYLAND CASUALTY COMPANY, Defendant.**

**Civ. A. No. 3270.**

United States District Court
E. D. Tennessee, N. D.

April 28, 1959.

Thos. P. Mikell, Philadelphia, Pa., Egerton, McAfee, Armistead & Davis, Knoxville, Tenn., for plaintiff.

Kramer, Dye, McNabb & Greenwood, Knoxville, Tenn., for Maryland Casualty Co.

Frantz, McConnell & Seymour, E. Bruce Foster, Knoxville, Tenn., for Westinghouse Electric Co.

ROBERT L. TAYLOR, District Judge.

This case was transferred to this court by the United States District Court for the Eastern District of Pennsylvania, under Title 28, U.S.Code, § 1404(a), for the convenience of the parties and the witnesses.

Plaintiff is a Pennsylvania corporation and the defendant a Maryland corporation. The amount in controversy is in excess of $10,000.

The incident that caused the damages that are the subject of the suit occurred in Tennessee on April 11, 1956. The Boiler and Machinery insurance policy which plaintiff claims covered the losses was issued and delivered by the defendant in Tennessee on January 5, 1955. Electro Manganese Corporation, of Knoxville, Tennessee, was the original named assured. By Endorsement No. 9 dated March 16, 1956, Item No. 1 of the policy was amended to read "Foote Mineral Company," said company having previously purchased all of the assets of the Electro Manganese Corporation.

The policy is described as a Boiler and Machinery Policy which insured plaintiff against loss by accident of objects described in detail in schedules 1 and 2 and the amendments thereto.

Schedule No. 1 is entitled "Electrical Machines." The items insured were divided into groups. Group No. 1 insured "Electrical Generators of 50 kw or larger and Electric Generators used as Exciters." One of these generators, which was a 1500-kilowatt Westinghouse, was greatly damaged as a result of an explosion while its commutator was being ground on April 11, 1956, by a representative of the Westinghouse Electric Corporation of Atlanta, Georgia.

Group No. 2 of Schedule No. 1 insured "F'ectric Motors of 70 h. p. or larger." One of the motors described in this group, and the one which was attached to the damaged generator, was completely destroyed by fire at the time of the incident which caused damage to the generator.

The original complaint sought to recover damages in the amount of $34,101.-15 for injuries to the generator and motor, but after a fire insurance company paid plaintiff the sum of $14,453.06

damages for the loss of the motor, the claim under this item was reduced to $19,648.09.

The policy also insured against loss for partial prevention of business caused by accident under what is termed the "Use and Occupancy" endorsement. This item amounted to $56,790.67.

There is no dispute as to the amount of damages sustained by plaintiff as a result of the accident. Counsel for the defendant stipulated during the trial that the generator was damaged in the sum of $19,648.09 and that the damage caused by partial prevention of business while the generator was being replaced was $56,790.67.

The insuring agreement provides, in pertinent part, as follows:

"In consideration of the Premium, the Company agrees with the Assured respecting loss from an Accident, as defined herein, occurring during the Policy Period, to an Object, as defined herein, while the Object *is in use or connected ready for use * * *.*" (Emphasis supplied.)

Defendant contends that the generator was not in use or connected ready for use at the time of the incident causing the damage, and that it is not liable to the plaintiff for the loss. Plaintiff contends that the generator was in use or at least connected ready for use at the time of the accident and that the loss was covered by the policy.

Special Provision D(a), under Schedule No. 1, provides:

"The Company shall not be liable for loss from an Accident to any Object which is designated and described in this Schedule while said Object is undergoing an insulation breakdown test, *or is being repaired or dried out.*" (Emphasis supplied.)

Defendant further contends that it is not liable to plaintiff for the damages to the generator because it was being repaired at the time of the incident causing the damages. Plaintiff contends that the work being done on the gener-

ator at the time of the accident was preventive maintenance and that the foregoing exclusion does not prevent recovery.

The policy definition of an accident is as follows:

"C. As respects any Object which is designated in this Schedule, 'Accident' shall mean

"1. A sudden and accidental breaking of the Object, or any part thereof into two or more separate parts, but not the breaking of any shear pin, safety link, vacuum tube, gas tube, fuse, brush or insulation, nor the loosening of any assembled parts;

"2. A sudden and accidental burning out of the Object, or any part thereof, but not the burning out of insulation unless accompanied by a short-circuit, or of any vacuum tube, gas tube, fuse or brush; or

"3. A sudden and accidental deforming of any shaft of the Object, not caused by the cracking of such shaft."

A description of the generator on which the work was being done at the time of the accident and a detailed explanation of such work, will be helpful to an understanding of the problems that are under consideration.

A schematic drawing showing the component parts of a generator similar to the one involved in the accident is filed in the record.

The generator consisted of a number of enclosed coils of copper wire called the armature, which armature was attached to a shaft and revolved on that shaft in a magnetic field produced by magnets which surrounded the armature with the magnets being held in place by the outside plate of the generator. On the same shaft and immediately adjacent to the armature was a circular metal ring made in segments, which segmatic ring is known as a commutator. The segments, or commutator bars, were connected with the ends of the coils of copper wire composing the armature.

Brushes made of carbon and held by brush holders pressed against the commutator. The function of the brush holders was to hold the carbon brushes in position at the correct angle against the commutator and to maintain the necessary brush pressure on the commutator. The shaft to which was attached both the armature and commutator was coupled to a motor which caused the shaft to rotate and the armature fixed to it to revolve in the magnetic field produced by the magnets surrounding the armature, and electric voltage was thereby produced. This electric voltage was then transmitted to the commutator from the coils of wire composing the armature. In the commutator the electric voltage thus transmitted to it was converted into direct current and was then transmitted from the commutator by the carbon brushes held by the brush holders.

Carbon brushes, in the process of generating electricity, press against the outer surface of the commutator causing wear and deterioration to the brushes as well as the outer surface of the commutator. The commutator surface, after prolonged use, becomes grooved, rough and scarred, uneven and pitted, and out-of-round, which if not corrected will ultimately result in a breakdown of the generator. When a scarred or roughened condition develops, it is necessary to eliminate the scars and pits and to true up the surface of the commutator, thus restoring it to a sound and good working condition. Some generators require grinding at periods of from around four to six months while others last for years. The conditions under which the generator is operated control the frequency or infrequency of the grinding periods. The generator in question was ground at periods of six months to one or two years. It was installed in 1943 and continued in use until the time of the accident.

One arm that holds a set of brushes was removed to mount the precision grinding machine. The damaged machine and the other machine covered by the insuring agreement were closed down on April 10, 1956, in order for the work to be done. The grinding started about 10:30 a. m. on April 11th and the accident occurred about 12:30 p. m. The work had not been completed at the time of the accident. The machine was not to return to service until the work was completed. No current was going to the cell room from the generator at the time of the accident.

The use to which the generator was put was "to convert the commercially available alternating current into the direct current necessary for the operation of electrolytic cells for the production of manganese metal." This fact is stated in Section IX of the complaint and is confirmed by the proof.

Immediately before the accident, mechanic Cantrell observed sparks flying from the generator. This was called to the attention of Aycock, the Westinghouse representative, who discontinued the work to observe the flying sparks. About the time he quit grinding a loud explosion occurred. At that time, or about that time, a fire started in the region of the motor.

In addition to the grinding of the commutator, Aycock was to install a new set of brushes, seat them to the commutator surface and undercut mica strips between the commutator bars.

The generator was not on the line at the time this work was being done. The circuit breaker located between the generator and cell room was open; all of the 320 brushes were removed; one brush holder arm was removed and the precision grinding instrument was installed in its place. The generator was disconnected so it was incapable of furnishing power to the cell rooms to manufacture manganese metal. The generator was neither in use nor was it connected for use after it was taken off of the line on April 10, 1956.

Before the generator could have returned to use it would have been necessary to complete the grinding, restore the brush holder arm, install a complete set of carbon brushes, reseat the brushes,

remove any copper dust that may have settled on or around the machine incident to the grinding of the commutator. This procedure would have taken several hours. The generator was incapable of supplying electric current to the cell rooms after the carbon brushes were removed from the generator.

As previously indicated, plaintiff contends that the generator was in use or at least connected ready for use at the time of the incident as it was part of a set consisting of the exciter, motor, and generator; that the exciter was energized and the motor was being run by alternating current furnishing a mechanical power to rotate the shaft so that the commutator of the generator could be resurfaced with the precision grinding instrument.

Plaintiff further contends that precision grinding of the commutator was one of the uses for which the generator was purchased, and that such use was in contemplation of the parties to the contract.

Plaintiff also insists that this is at least a reasonable interpretation of the language of the policy, and that since it is subject to more than one interpretation, that the interpretation which is most favorable to the insured must be made.

The parties agree that the interpretation of the policy is controlled by Tennessee law. § 56–1102, T.C.A. Kustoff v. Stuyvesant Insurance Co., 160 Tenn. 208, 22 S.W.2d 356; King v. Mutual Life Insurance Co. of N. Y., D.C., 114 F.Supp. 700.

■ If the language in the policy is ambiguous so as to create doubt or uncertainty of meaning, the Court should adopt the construction most favorable to the insured. Alsup v. Travelers Insurance Company, 196 Tenn. 346, 268 S.W. 2d 90. It should be interpreted so as to carry out the intention of the parties. Harris v. State Farm Mutual Automobile Insurance Co., 6 Cir., 232 F.2d 532.

■ Another rule is that the language of a policy must be construed according to its plain, ordinary and popular mean-

ing unless by some known usage it has acquired a different meaning or unless it was the intention of the parties to the contract to use it in a technical or peculiar sense. Bonds-Sanders Paper Co. v. Travelers Fire Insurance Co., 12 Tenn. App. 479; Seay v. Georgia Life Insurance Co., 132 Tenn. 673, 179 S.W. 312; Travelers Insurance Co. v. Ansley, 22 Tenn.App. 456, 124 S.W.2d 37, and Harris v. State Farm Mutual Automobile Insurance Co., supra.

■ The language "in use or connected ready for use," is not obscure. Its meaning is plain. 43 Words and Phrases 460, 469, states one of the most common meanings of the word "use" as defined by Webster, is "usefulness, utility, advantage, productive of benefit."

Webster's New International Dictionary, Second Edition, defines it as: "1. Act of employing anything, or state of being employed; application; employment; as, the use of a pen, his machines are in use."

8A Words and Phrases, 157, 158, gives the following meaning for the word "connect": "To join, or fasten together as by something intervening; * * * to unite or link together, as in an electrical circuit."

Webster's New International Dictionary, Second Edition, gives as the first meaning, "1. To join, or fasten together as by something intervening whether physically or logically; as to connect towns together by a railroad; to unite or link together, as in an electrical circuit."

The Court is of the opinion that the language "in use or connected ready for use" was used by the parties to the contract in its ordinary, common and popular sense. Wallace v. State Farm Mutual Automobile Insurance Co., 187 Tenn. 692, 701, 216 S.W.2d 697; Sadler Machinery Co. v. Ohio National, Inc., 6 Cir., 202 F.2d 887, and Lattimore v. Merchants Fire Assurance Corporation, D.C., 151 F.Supp. 396, 399.

■ The usual and ordinarily understood meaning of an object being "in

use" is when said object is being used for the purpose for which it was designed. Leete v. Hays, 211 Iowa 379, 233 N. W. 481, 484. The generator was not "in use" for the purpose for which it was designed at the time of the accident.

The motor and generator that were involved in the accident were referred to in the declaration as a "set," but in Schedule No. 1 the generators and motors were listed as separate objects. The generators were covered in Group No. 1, and the motors in Group No. 2.

The motor was performing the function of driving the generator at the time of the accident. The generator was not producing direct current. This was the purpose for which it was designed, or as the experts sometimes stated, it was not converting alternating current into direct current, for use in the electrolytic cells for the manufacture of manganese metal.

At the time of the accident the generator was not connected with the cells. The brushes which were designed to take the current from the commutator to the bus bars were disengaged, and in the language of the witnesses "the machine was off the line."

In summary, the 1500-kilowatt, 250-volt, generator was purchased and installed for the sole purposes of (1) generating and (2) transmitting direct current for use in manufacturing manganese metal, and it was not in use or connected ready for use at the time of the accident which caused the damage that is the subject of this suit.

The proof shows that the hazards are greatly increased when work is being done on the generator.

The proof further shows that it is not feasible—if not impossible—to grind a commutator while the generator is in use or connected ready for use. There is danger of the workmen permitting some tool to come in contact with the machine, and there is the danger to the workmen themselves. These are hazards which do not exist while the generator is in use. Payment of a larger premium is required

for coverage while the generator is not in use or connected ready for use. Premium was not paid for the coverage contended for by plaintiff in this case.

We now come to the second and final question involved in the suit. That is, whether the machine was undergoing repairs at the time of the accident. In view of the holding that plaintiff's loss was not covered by the policy, the only purpose in passing on this question is to have the record complete in the event of an appeal.

Plaintiff contends, as heretofore stated, that the machine was undergoing preventive maintenance at the time of the accident; that the parties contemplated such maintenance at the time the contract was written, and that the terms of the policy are sufficient to insure against loss while the work was being done.

The defendant contends that the word "repair" as used in the policy is a common word and connotes the ordinary, plain and popular meaning of that word; that the word as used in the policy does not have a meaning in the electrical industry different from its meaning in other industries. The proof is sharply divided on this issue.

The witnesses introduced by the plaintiff testified that the words "repair" and "maintenance" have a technical and distinctive meaning in the electrical industry, while the witnesses for the defendant testified that these words have the same meaning in the electrical industry as they do in other businesses.

Plaintiff's witnesses expressed the view that the word "repair" applies only to situations where a machine has suffered a complete breakdown and that some part, or parts, must be replaced because of having been severed or broken. "Maintenance," according to them, is that which periodically occurs. Repair has an element of the unexpected in it. Maintenance is planned for while repair is not. Repair is something unexpected; maintenance is something you see ahead.

Witnesses for the defendant were of the opinion that repair is fixing worn out

parts or defects caused by breaks. Maintenance is doing something to preserve the machine. Repair does not include cleaning and periodic inspections; while maintenance does include cleaning and periodic inspections and, as one witness put it, this is the only difference between the two terms. This same witness classified "repair" as everything done while the machine is out of service; while "maintenance" does not require the machine to be taken out of service while the work is being done.

The courts have sometimes construed the terms "maintenance" and "repair" as equivalents. Maintenance has been construed to include repair. Tennessee Electric Power Co. v. White County, 6 Cir., 52 F.2d 1065.

If the word "repair" has a restrictive meaning in the electrical industry, the burden was upon plaintiff to prove it. In E. E. Kelly & Co. v. United States, the Court said:

"If the word 'repairs' has a restricted meaning in the trade and commerce of the United States which excludes so-called maintenance painting, it was incumbent upon appellants to prove that fact by a preponderance of the evidence. Furthermore, it is elementary that the evidence must show that such restricted trade meaning is uniform, definite, and general, and not partial, local, or personal." 17 CCPA 30, 33.

The Court is of the opinion that the word "repair" was used in the contract in its common, plain and popular sense and that it is not ambiguous. An ambiguity does not arise in a contract by reason of the parties to the contract differing as to the interpretation of various provisions. American National Bank at Indianapolis v. Service Life Insurance Co., 7 Cir., 120 F.2d 579, 582, 137 A.L.R. 1148.

If there is no ambiguity in the contract, its interpretation becomes a question of law. Ætna Life Insurance Co. of Hartford, Conn., v. Bidwell, 192 Tenn. 627, 630, 241 S.W.2d 595.

An insurance contract, like other contracts, should be construed according to the meaning of the terms as the parties used them in the contract. Wray v. Metropolitan Life Insurance Co., 19 Tenn.App. 533, 535, 539, 91 S.W.2d 577.

If the language is clear, it is to be taken and understood in its plain and ordinary sense.

There is nothing obscure about the meaning of the word "repair" as used in the policy. It is not necessary to look to a particular business for its meaning. It is a common word with which ordinary people are familiar and with which they deal almost daily.

Webster's New International Dictionary, Second Edition, defines it as "to restore to a sound state, or good state after decay, injury, dilapidation or partial destruction; as to repair a house, a road or a shoe." In the Century Dictionary, 1936 Edition, "to restore to a good or sound condition, as decay or damage * * * restore, renovate or renew by any process of making good, strengthening, supplying * * *."

That which was being done by Mr. Aycock on the generator at the time of the accident fits the foregoing definitions. It is the meaning which the ordinary person ascribes to the term, and in the opinion of the Court it is this meaning that the parties had in mind when the contract was made.

The Court concludes that the generator was being repaired at the time of the accident and that the aforementioned exclusion provision of the policy precludes recovery for the loss.

Let an order be presented in conformity with the views here expressed.