LINDA LAYNE, individually and )
as the surviving spouse of )
JAMES T. LAYNE, )
)
      Plaintiff/Appellant, )    Appeal No.
)    01-A-01-9809-CH-00457
v. )
)    Rutherford Chancery
PIONEER LIFE INSURANCE )    No. 95CV771
COMPANY OF ILLINOIS, )
)
      Defendant/Appellee. )

**FILED**

September 1, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

COURT OF APPEALS OF TENNESSEE

APPEAL FROM THE CHANCERY COURT FOR
RUTHERFORD COUNTY
AT MURFREESBORO, TENNESSEE

THE HONORABLE JAMES L. WEATHERFORD, CHANCELLOR

ROGER W. HUDSON
16 Public Square North
P. O. Box 884
Murfreesboro, Tennessee 37133-0884
    ATTORNEY FOR PLAINTIFF/APPELLANT

MALCOLM L. McCUNE
Blackburn, Slobey, Freeman
 & Happell
414 Union Street, Suite 2050
NationsBank Plaza
Nashville, Tennessee 37219
    ATTORNEY FOR DEFENDANT/APPELLEE

AFFIRMED AND REMANDED

WILLIAM B. CAIN, JUDGE

O P I N I O N

This is a suit in chancery for declaratory judgment relative to a policy of insurance. The primary question presented is whether or not participation by the insured in a motorbike event known as an "enduro" constitutes "racing" within the meaning of an exclusion in the policy. After the insured died from injuries he received while participating in an "enduro," the defendant insurance company denied coverage. The lower court found that the particular loss in this case was excluded from coverage. We affirm the decision of the trial court.

## I. FACTS

James T. Layne purchased the policy in issue in December of 1989 and the policy was in full force and effect at all times material in this case. The policy provided "catastrophic hospital expense coverage" and contained an exclusion providing:

A    Claims will not be paid for any loss resulting from:

. . .

15. Racing of any land or water vehicle in an organized event ....

On June 12, 1994, James T. Layne was operating his Honda motorcycle in an "enduro" in Jackson County, Ohio when he lost control of the motorcycle and suffered severe injuries which resulted in his death on June 21, 1994. Extensive medical and hospital expenses were incurred at Ohio State University Hospital in the treatment of Mr. Layne prior to his death. After paying $8,863.34 in benefits to the hospital, the defendant Pioneer Life Insurance Company of Illinois determined that the claim was barred by exclusion Number 15 in the insurance policy and thereupon discontinued payments leaving an additional $65,288.91 in medical bills outstanding.

After trial on the merits the trial judge held that the exclusion applied and rendered judgment for the defendant insurance company. Plaintiff, Linda Layne, individually and as surviving spouse of James T. Layne, appeals asserting:

1.    That the policy exclusion did not apply.

2.    That the defendant had waived any right to rely upon the policy

2

exclusion.

3.    That the defendant was estopped from asserting the exclusion.

4.    That regardless of the exclusion the defendant was liable for family security benefits and return of premium for accidental death under the provisions of the contract.

5.    That the defendant was guilty of bad faith under Tennessee Code Annotated section 56-7-105.


## II.  THE EXCLUSION

For the exclusion to apply, the insured must have been:

1.    Racing.

2.    Any land or water vehicle.

3.    In an organized event.

A motorcycle is obviously a land vehicle.  The proof is undisputed in the record that this enduro was organized by the Little Raccoon Dirt Riders Club and sanctioned by the American Motorcycle Association.  This leaves for determination whether or not the insured was "racing" which requires a determination of whether or not the June 12, 1994 "enduro" was in fact a "race."

The trial court held that an "enduro" was a race.  To the extent that this holding represents finding of fact, it is reviewable in this court under Rule 13(d) of the Rules of Appellate Procedure with the trial court finding presumed to be correct unless the preponderance of the evidence is otherwise.  The trial court's findings of law are reviewed de novo without such a presumption.  *Hawks v. City of Westmoreland*, 960 S.W.2d 10, 15 (Tenn. 1997).

An "enduro," as established by the testimony of witnesses familiar with such an event, is a cross country ride some 75 to 100 miles long, over public roads, logging roads, or just trails through the woods.  The particular route to be followed is laid out by the organizers and there are various check points along the route.  Average speed ranges from 18 to 30 miles per hour with the greatest percentage of enduros set up on a projected 24 mile per hour average.  The object is to arrive at given check points on time with penalty points occurring

3

for arriving too early or arriving too late. All traffic signals and traffic laws along the route must be obeyed and the motorcycle is required to be street legal with a license plate, a burning headlight and taillight, and a forester approved spark arrester or muffler. If for any reason a rider is delayed between check points, he necessarily must increase speed to try to catch up before the check point. Conversely, if he gets ahead of average he must slow down in order to reach the check point at the projected time. The ultimate object at the end of the 75 to 100 mile course is to arrive with no penalty points for being either too slow or too fast. An enduro is generally divided into approximately 20 classes with a winner in each class and trophies given to those finishing in the higher echelons of each class.

The plaintiff's witness John Giles, an experienced enduro participant, testified:

> Q.   . . . [T]hey give you, let's take a hypo-thetical. To get from Point A to Point B the people that organize the enduro tell you you've got to get there in ten minutes, right, and if you get there longer than ten minutes you lose points, and if you get there in less than ten minutes you lose points?
> A.   They have flip cards at each check point and you are assigned a number. When you get to that check point, if you are averaging the speed average that's set up, your number will be up.
> Q.   So you've got to maintain a particular speed?
> A.   Right.
> Q.   So speed is important, but the highest speed doesn't determine the winner, it's the one that maintains the appropriate speed?
> A.   It's the one that has the less amount of points, whether it's earlier or late.
> Q.   And that's determined based upon the speed?
> A.   Right.
>                              . . .
> Q.   What is the highest score in an enduro?
> A.   Zero.
> Q.   Is an enduro in any way a contest of speed?
> A.   No, it's, you're riding against the course. Your objective is to ride, to maintain the same speed. Of course if you have to go over an object or around an object and you lose time, you are going to have to ride as quick as you can to make up that time. And if you get out on a logging road, you've got to slow down to maintain the speed. The object is to go at the speed average that's set.

4

In addition to testimony by experienced enduro contestants, the parties engaged in a battle of dictionaries with the plaintiff relying on various dictionary definitions of "racing" and the defendant relying on various dictionary definitions of "enduro."  By examination and cross-examination of the defendant's expert, Janet Erickson, it was established that the American Heritage Dictionary defines racing as follows:  "to compete in a contest of speed, to move rapidly or at top speed."  Webster's Ninth Collegiate Dictionary provides the following definition of "racing":  "to compete in a race, to go or move at top speed or out of control."  It was further established that the American Edition of Oxford University Press Dictionary defines "enduro" as "a long-distance race of motor vehicles, designed to test endurance."  The American Heritage College Dictionary defines "enduro" as "a race, as of motorcycles or runners, that test endurance."  Finally, Merriam Webster's Collegiate Dictionary defines "enduro" as "a long race (as for automobiles or motorcycles), stressing endurance rather than speed."

More important than dictionary definitions are reported cases directly on point or helpful by analogy.  Except for the specific wording of the policy exclusion, the following case from the Michigan Court of Appeals is almost identical to the case at bar.

> On September 25, 1966, [the insured] participated in an "enduro" motorcycle event sponsored by an Alma, Michigan, motorcycle club and sanctioned by the American Motorcycle Association.  While the Court lacks technical expertise on this growing sport, it is our understanding that an "enduro" is a competitive event between motorcycle riders in which the machine is driven over a predetermined course past several time-checks, the object of which is to arrive at the time-checks precisely on schedule.  The rider loses points if he arrives too early or too late.  The average speed in which this could be accomplished for the particular event in question was 24 miles per hour.
> . . .
> Most succinctly stated, the decisive query is whether an "enduro" motorcycle competition is a "race or speed contest" within the terms of the exclusionary clause of the insurance policy sold by the plaintiff to [the insured defendant].

The issue raised in the instant case is one of first impression

in the State of Michigan and requires an evaluation and definition of the term "race or speed contest." Defendant . . . concedes that he was engaged in an organized and prearranged contest recognized as an "enduro." While plaintiff contends that an "enduro" is a "race or speed contest" and that coverage under the policy is thus excluded, defendants argue that such a contest is not a race, but rather a contest in skill, endurance, precision, and performance.

. . .

Defendants here argue that in light of the nature of an "enduro," in that machines cannot be operated at their peak capabilities, and that, in order to win, a contestant must travel at an average speed of 24 miles per hour, then an "enduro" cannot be considered a race, since a race requires high speed. Such logic is unconvincing by virtue of the fact that, in order to win, the rider must maintain a precise speed over the course. Undoubtedly, if he goes too fast and gets too far ahead of the clock, he must go slowly to average out his speed.

It is equally true, however, that if the rider in some way falls behind the time alotted [*sic*] for each checkpoint, he must increase his speed, which in some instances may be to the maximum of the motorcycle. Hence, high speed could conceivably become a crucial factor in determining outcome. Furthermore, in light of the averaging factor, it is difficult to imagine any other motor vehicle contest where speed and speed-control play a more important part. This Court finds it most difficult, if not impossible, to distinguish the "enduro" as a race or speed contest from such events as "hill-climbing, T.T. race, hare and hound chase and corner pulling." The competitive phase of locomotion characteristic of the enduro in which defendant . . . competed was no less a race or speed contest than that participated in by Dick Mann this year, when he streaked across the finish line at Daytona Beach; both contests being extreme tests of skill, endurance, precision, as well as performance.

*Universal Underwriters Co. v. Semig*, 182 N.W.2d 354, 356-57 (Mich. App. 1970) (footnote omitted).

While the exclusion in *Semig* is more detailed than the exclusion in the Pioneer Life Policy, the same prerequisites for the application of the exclusion are evident. While a motorcycle is specifically named in *Semig*, it cannot be doubted that a motorcycle is a "land vehicle" within the meaning of the Pioneer policy. In *Semig*, the motorcycle was being used in a "pre-arranged or organized race or speed contest" and in the Pioneer exclusion the motorcycle was being used in "an organized event." The third factor of the *Semig* exclusion involved

a "race or speed contest." The Pioneer exclusion requires that the motorcycle was being used in "racing." The reasoning in *Semig*, while not controlling, is analogous and persuasive.

*Semig* relied on *City of Madison v. Geier*, 135 N.W.2d 761 (Wis. 1965), wherein the Wisconsin court observed that "[a] race is an intentional competition in respect to some phase of locomotion. The dominate characteristic of a race is the awareness or intent of competition in respect to speed and distance to prove superiority in performance in some respect." All of the proof in this case indicates that the enduro described in *Semig* is precisely the same kind of enduro in which James Layne was participating when he was fatally injured.

Further support for our case is found in an opinion from the Supreme Court of Tennessee, which defines the term "race" in the context of a statute purporting to prohibit gambling on races. The court observed as follows:

> The term was used by the framer of the statute to accomplish a practical purpose and in a popular and well-defined sense; that is, in a sense which involves the idea of competitive locomotion. In other words, it here embraces every contest or trial of progression, including speed and endurance, one or both, whether in running, trotting, walking, driving, riding, sailing, rowing, etc. It therefore includes a foot race, a horse race of any kind, an automobile race, a steam boat or yacht race, or any other form of competitive movement or progression.

*State v. Hayes*, 116 Tenn. 40, 93 S.W. 98, 99 (1906).

We are cognizant of the time honored rule that ambiguous exclusions should be strictly construed against the insurer. This is, however, a rule of contract construction and is uniformly adhered to "but must yield to the primary rule that policies of insurance, like other contacts, are to be construed so as to give effect to the intention and express language of the policy." *Travelers Ins. Co. v. Ansley*, 22 Tenn. App. 456, 124 S.W.2d 37, 42 (1938).

Before entering the June 12, 1994 enduro, James Layne signed a release

7

and waiver of liability and indemnity agreement with the sponsoring organization wherein he expressly acknowledged and agreed "that the activities of the event are very dangerous and involve the risk of serious injury and/or death and/or property damage."  While this was a general form, applicable to all racing events, it is nonetheless revealing as relates to an enduro.  "Ordinarily, an exclusion in a policy of insurance is a means employed by the insurer to protect itself from an additional risk or hazard against which it does not wish to insure without the payment of an additional premium." *Jarman v. Export Ins. Co.*, 59 Tenn. App. 245, 439 S.W.2d 785, 789 (1968).  The trial court correctly held that the "racing" exclusion was applicable and the Pioneer policy provided no coverage for the tragic events of June 12, 1994.

## III.  WAIVER AND ESTOPPEL

Appellant asserts that Pioneer Life has waived its right to rely upon the exclusion or is estopped to do so.  The proof shows that prior to invoking the exclusion,  Pioneer Life had paid $8,864.34 in medical bills under the policy.  Pioneer Life does not seek reimbursement for these payments.  It is obviously to the great disappointment and disadvantage of the plaintiff that she is compelled to pay the substantial medical expenses not recoverable from Pioneer Life because of the racing exclusion.  Before one may invoke waiver and estoppel, however, that party must have taken a position to the detriment of that party because of the action or inaction of the insurance company.  *Henry v. Southern Fire & Cas. Co.*, 46 Tenn. App. 335, 330 S.W.2d 18 (1958).  The record contains no proof of such detriment.  It is encumbent upon the party alleging a waiver to establish, by competent proof, that such party has been prejudiced by any change of position by the other party.  *Spears v. Commercial Ins. Co.*, 866 S.W.2d 544, 549 (Tenn. App. 1993), *overruled on other grounds by Harrell v. Minnesota Mut. Life Ins. Co.*, 937 S.W.2d 809 (Tenn. 1996).  The record contains no evidence to support detriment or prejudice to the plaintiff and the defenses of waiver and estoppel must fail.

## IV.  FAMILY SECURITY BENEFIT AND RETURN OF PREMIUM FOR ACCIDENTAL DEATH

The plaintiff asserts that these benefits are payable under the policy regardless of the racing exclusion. She relies upon the following provisions of the insurance policy:

I.     FAMILY SECURITY BENEFIT

Upon due proof of your death occurring while your coverage is in force,we will waive further premium for any of your eligible dependents who were insured under the group policy as your dependents on the date of your death. The waived premium will begin on the monthly anniversary date and continue to be waived for twelve months. During this period, we will provide all of the benefits for which your eligible dependents were insured at the time of your death; provided that coverage will terminate if the group policy terminates.

J.     RETURN OF PREMIUM FOR ACCIDENTAL DEATH

If, while this coverage is in force, an insured person suffers an injury and, within 90 days of such injury, dies solely as a result of such injury, the company will pay to the insured's estate, an amount equal to all premiums paid under the policy prior to the date of the insured's death.

No payment will be made under this section if death results from:
1.   ptomaines or bacterial infection except when resulting from accidental ingestion of poisonous food substances, and except pyogenic infection which occurs with and as a result of an accidental cut or wound; or
2. bodily or mental disease or disorder, or medical or surgical treatment therefor; or
3. voluntary inhalation of gas.

The "benefits" of this policy are specifically set forth in Part II of the policy entitled "Benefits." These benefits are then listed in sections A through P. The charges for hospital expenses are listed under the benefits section as "A." Part III of the policy is titled "Exclusions and Limitations." The opening sentence of this section, prior to the numerical listing of exclusions, states that: [c]laims will not be paid for any loss resulting from" the specific exclusions. (emphasis added). Since the "accidental death" of Mr. Layne itself resulted from "racing" within the meaning of the exclusion, it is difficult to see how the Part II benefits can be divided into component parts.

The meaning of the Pioneer Life policy is plain. The exclusions listed in Part III are applicable to all claims under the policy and once it is established under the facts that the exclusion is effective, an insured is not entitled to recover benefits of any kind under the policy. This court has held as follows:

> The parties' respective rights and obligations are governed by their contract of insurance whose terms are embodied in the policy. As with any other contract, our responsibility is to give effect to the expressed intention of the parties by construing the policy fairly and reasonably, and by giving the policy's language its common and ordinary meaning. We are not at liberty to rewrite an insurance policy simply because we do not favor its terms or because its provisions produce harsh results. In the absence of fraud, over-reaching, or unconscionability, the courts must give effect to an insurance policy if its language is clear and its intent certain.

*Black v. Aetna Ins. Co.*, 909 S.W.2d 1, 3 (Tenn. App. 1995) (citations omitted).

The final claim of the plaintiff is for recovery of the penalty provided by Tennessee Code Annotated section 56-7-105 to be predicated upon a finding that the defendant was guilty of bad faith. In view of the disposition made herein the statutory penalty is not recoverable. The judgment of the trial court is in all respects affirmed with costs assessed against the plaintiff.

_____
WILLIAM B. CAIN, JUDGE

CONCUR:

_____
BEN H. CANTRELL, P.J., M.S.

_____
WILLIAM C. KOCH, JR., JUDGE

10